Exhibit 4

Page 1

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  Civil Case No. 13 CV 1432

   - - - - - - - - - - - - - - - - - -x

4  WILLIAM HENIG, on behalf of himself and

   all others similarly situated,

5

                        Plaintiff,

6

         -against-

7

   QUINN EMANUEL URQUHART & SULLIVAN, LLP,

8  and PROVIDUS NEW YORK, LLC,

9                       Defendants.

10 - - - - - - - - - - - - - - - - - -x

11                      233 Broadway

                        New York, New York

12                      July 18, 2014

                        10:10 a.m.

13

14        PRIVILEGED - CONFIDENTIAL

15        SUBJECT PROTECTIVE ORDER

16

17     DEPOSITION of MICHAEL BELGRAIER, a

18 witness appearing on behalf of the

19 Defendants in the above-entitled action,

20 held at the above time and place, taken

21 before Brian Brenner, a Shorthand Reporter

22 and Notary Public of the State of New

23 York, pursuant to the Federal Rules of

24 Civil Procedure, Court Order and

25 stipulations between Counsel.

1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2        Q     Mr. Belgraier, are you an

3    attorney?

4        A     Yes.

5        Q     Where are you admitted to

6    practice?

7        A     New York.

8        Q     When were you admitted?

9        A     March 2014.

10       Q     Is the State of New York the

11   only jurisdiction in which you're

12   admitted?

13       A     Yes.

14       Q     And when did you pass the Bar

15   exam?

16       A     February 2013.  I took the

17   February 2013 exam.  I got my scores

18   months later.

19       Q     When did you graduate from law

20   school?

21       A     May 2012.

22       Q     Where did you go?

23       A     To Pace University School of

24   Law.

25       Q     Where did you work since

```
 1      M.  BELGRAIER  -  PRIVILEGED  -  CONFIDENTIAL
 2    graduating  law  school?
 3         A       At  Quinn  Emanuel.
 4         Q       So  that's  the  only  job  you've
 5    held?
 6         A       Yes.
 7         Q       When  did  you  start  there?
 8         A       Late  August  2012.
 9         Q       Did  you  take  the  July  2012  Bar
10    exam?
11         A       I  did.
12         Q       You  hadn't  found  out  at  that
13    point  in  August  2012  whether  you  passed  or
14    not?
15         A       Correct.
16         Q       How  did  you  find  --
17              MS.  SCHULMAN:     Strike  that.
18         Q       What's  your  position  at  Quinn
19    Emanuel?
20         A       I  am  a  contract  attorney  there.
21    Currently  I  am  a  contract  attorney.
22         Q       Was  that  the  only  position
23    you've  held  there,  or  was  that  your
24    position  when  you  were  hired?
25         A       When  I  was  hired  there,  I  was
```

Page 17

1   M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2       A     Yes.

3       Q     Did your pay change after you

4   were admitted to the Bar?

5                 MR. KITCHENS:    Objection.   This

6       is completely irrelevant to whether

7       Mr. Henig was practicing law or not.

8       Q     Please answer.

9       A     As I understand it, my pay

10  increased as the normal increase is done

11  every year.

12      Q     Annual increases?

13      A     Yes, annual increase.

14      Q     Not necessarily tied to being

15  admitted to the Bar?

16      A     Correct.

17      Q     But you started working on the

18  ▉ project immediately when you started

19  employment with Quinn?

20      A     Yes.

21      Q     How long did you continue

22  working in that project?

23      A     I continue to work on that

24  project.

25      Q     To this day?

```
 1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL
 2         A     Yes.
 3         Q     Exclusively?
 4         A     Yes.
 5         Q     So that's the only project
 6    you've worked on for the firm?
 7               MR. KITCHENS:   Objection.
 8         A     Yes.
 9         Q     When you first started at Quinn,
10    that was August 2012?
11         A     Um-hmm.
12         Q     Please say yes or no.
13         A     Yes.
14         Q     What was your role on the
15    project at that time?
16         A     My role was to determine the
17    responsive nature of documents during
18    analysis of the documents and our fees and
19    request for production.
20         Q     Were you first-level review,
21    second-level review?
22         A     Second-level review.
23         Q     What's the difference between
24    first-level review and second-level
25    review?
```

1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2         A      At 51 Madison.

3         Q      Did you ever work at the offsite

4    location where the Providus contract

5    attorneys worked?

6         A      From time to time.

7         Q      How did you know where you were

8    working on a particular day?

9              MR. KITCHENS:    Objection.

10        A      Oh, we had a schedule calendar

11   that would tell you what date you were

12   going to be there and what room you would

13   be in.

14        Q      Mr. Belgraier, are you familiar

15   with how the first-level reviewers did

16   their work, or are you only familiar with

17   how you did your work as a second-level

18   reviewer?

19             MR. KITCHENS:    Objection.

20        A      What do you mean by how they did

21   their work?

22        Q      Do you know the guidelines that

23   they were subject to in performing the

24   document review?

25        A      What guidelines?

Page 21

1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2              MR. KITCHENS:   Objection.

3         Q    The guidelines that they had to

4    follow in coding documents.

5              MR. KITCHENS:   Objection.

6         A    I'm more familiar with the

7    guidelines I had to use in the performance

8    of my work.

9         Q    So you're not familiar with the

10   differences between those guidelines and

11   the first-level review guidelines, if

12   there were any differences?

13        A    I don't recall any.

14        Q    The documents that you were

15   reviewing had already been marked in some

16   way by a first-level reviewer; is that

17   correct?

18        A    Yes.

19        Q    If a first-level reviewer had

20   marked a document responsive, could you

21   change that to not responsive?

22        A    Yes.

23        Q    Did you sometimes do that?

24        A    Yes.

25        Q    If you marked a document not

```
 1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL
 2   responsive, did that mean it that would
 3   not be produced in litigation?
 4        A     Yes.
 5        Q     Would anyone review your
 6   decision do mark a document not
 7   responsive?
 8        A     I'm not familiar with any sort
 9   of third level of review on not responsive
10   documents.
11        Q     When you say you're not
12   familiar, do you mean that there was not a
13   third-level review or that you don't know
14   whether there was a third-level review?
15        A     I don't know whether there was.
16             MR. KITCHENS:   Is now a good
17       time to break?
18             MS. SCHULMAN:   I guess.
19             [A recess was taken.]
20             MS. SCHULMAN:   Back on the
21       record.  Can I have the last question
22       and answer read back?
23             [Whereupon, the requested
24       portion of the record was read back by
25       the Court Reporter.]
```

```
 1     M. BELGRAIER - PRIVILEGED - CONFIDENTIAL
 2        Q     Mr. Belgraier, some of the
 3   documents that you were reviewing as a
 4   second-level reviewer had already been
 5   marked as privileged, correct?
 6        A     Yes.
 7        Q     And you could change that tag to
 8   not privileged?
 9        A     I could, yes.
10        Q     A document that you reviewed
11   that had not yet been tagged privileged,
12   you could tag as privileged?
13              MR. KITCHENS:    Objection.
14        A     Yes.
15        Q     If you changed a document with a
16   privileged tag from privileged to not
17   privileged, does that mean it would not be
18   reviewed on privilege review?
19        A     I don't know.
20        Q     Did you ever work on privilege
21   review?
22        A     No.
23        Q     Do you know what it is?
24        A     Yes.
25        Q     What's your understanding of
```

1     M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2         A      To let him know if we notice

3     some non-work behavior, to let him know.

4         Q      And then you responded on

5     October 10, 2012, correct?

6         A      Yep.

7         Q      Looking ator e-mail from that

8     day, the 3:34 p.m. e-mail, do you recall

9     what was happening with Mr. Henig?

10        A      What e-mail is that, the 3:34?

11        Q      Yes.

12        A      I don't recall exactly what was

13    occurring, but if I read my e-mail, it

14    says he's sitting right next to me and

15    it's been a conspicuous amount of time of

16    no-views.

17        Q      Meaning what?

18        A      That he was not looking at

19    documents.

20        Q      Now, do you recall anything

21    about the incident other than what's in

22    the e-mail?

23        A      No.

24        Q      And then there ace a little more

25    back and forth between you and Mr. Reigler

```
 1      M. BELGRAIER - PRIVILEGED - CONFIDENTIAL
 2          Q      Before and after you were
 3   admitted to the Bar were you doing
 4   second-level review?
 5          A      I was always performing
 6   second-level review.
 7          Q      And from the day before you were
 8   admitted to the day after you were
 9   admitted, were there any differences in
10   your job?
11          A      No.
12          Q      And the difference is that has
13   happened because of differences in the
14   nature of the project?
15          A      Correct.
16                 MS. SCHULMAN:   Let's take a
17          break.
18                 [A recess was taken.]
19                 MS. SCHULMAN:   Back on the
20          record.  I have no further questions.
21   EXAMINATION BY
22   MS. SUTTON:
23          Q      Sir, you discussed earlier with
24   other counsel the term that was used a
25   target for documents per hour.  Do you
```

1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2    recall that?

3        A    Target?  No.  It was more like a

4    guideline, a general idea of how much you

5    should be able to review in an hour.

6        Q    So was there a -- were you

7    familiar on the review of the term target

8    number of documents per hour?

9        A    No.

10       Q    Was there guidance as to how

11   many documents a reviewer should do an

12   hour?

13       A    Generally it was stated as 50 to

14   60 an hour, but really it was, you know,

15   perform accurate review, accurate analysis

16   however long it would take.

17       Q    And do you know one way or the

18   other if the guideline for first-level

19   reviewers and second-level reviewers was

20   the same?

21       A    Yes.

22       Q    So what was the guideline for

23   first-level reviewers, if you know?

24       A    To accurately review up to 50 to

25   60 an hour, but as many as you could do in

```
 1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL
 2   performing their review?
 3       A      Those were the instructions that
 4   we had and it's just not part of
 5   performing the document review and legal
 6   analysis.
 7       Q      What do you mean, these were the
 8   instructions that we had?
 9       A      The instructions that we had
10   were to not rely on highlighted terms but
11   to read the document and then perform the
12   legal analysis based on the RFPs.
13       Q      That was the training given to
14   the second-level reviewers?
15       A      Um-hmm.
16       Q      Please say yes or no.
17       A      Yes.
18       Q      But you were not present for any
19   of the training given to first-level
20   reviewers, correct?
21       A      Correct.
22       Q      Did you go to a licensed
23   attorney every time a first-level reviewer
24   came to you with a question about document
25   coding?
```

1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2         A      Yes.

3         Q      I thought you said that you

4    would work it out with the first-level

5    reviewer at the time most of the time.

6         A      I'm sorry, I might -- I thought

7    you meant -- oh, you can answer that

8    question, yes.

9         Q      So you would only go to a

10   licensed attorney if you were unable to

11   resolve the first-level reviewer's

12   question?

13        A      Yes.

14        Q      But sometimes you would resolve

15   it with the first-level reviewer on your

16   own?

17        A      Correct.

18        Q      Mr. Belgraier, what kind of

19   day-to-day supervision were you subject

20   to?

21              MS. SUTTON:   Objection.

22              You can answer if you

23        understand.

24        A      Can you clarify that, day-to-day

25   supervision?

1    M. BELGRAIER - PRIVILEGED - CONFIDENTIAL

2        Q        Well, you said you were

3    supervised by licensed attorneys.  How

4    were you supervised?

5        A        They would provide instructions

6    and training and were available to answer

7    the questions that we had.  There were

8    times if I had a question about a

9    document, I would be able to e-mail them

10   and they would be able to resolve my

11   questions.

12       Q        Did that happen on a daily

13   basis?

14       A        It happened from time to time.

15       Q        Did you make most of your coding

16   decisions independently?

17            MS. SUTTON:    Objection.

18       A        Yes.

19       Q        Please turn to Plaintiff's MB

20   Exhibit 2, the PowerPoint presentation.

21   Have a look at page QE00212052.  The third

22   big bullet point has attorney as

23   custodians, the documents that list

24   attorney as custodian should be marked as

25   privileged.  This instruction applied to