# Exhibit C

## REDACTED

Page 1

1

UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
Index No. 13 CV 1432
3   - - - - - - - - - - - - - - - - - -x
4   WILLIAM HENIG, on behalf of himself
and all others similarly situated,
5
Plaintiff,
6
7         -against-
8
QUINN EMANUEL URQUHART & SULLIVAN,
9   LLP and PROVIDUS NEW YORK, LLC,
10                  Defendants.
11  - - - - - - - - - - - - - - - - - -x
12       PRIVILEGED - CONFIDENTIAL
13      SUBJECT TO PROTECTIVE ORDER
14
15            July 3, 2014
16            9:43 a.m.
17
18      Deposition of WILLIAM HENIG,
19  taken by Defendants, pursuant to
20  Notice, held at the offices of Quinn
21  Emanuel Urquhart & Sullivan, LLP,
22  51 Madison Avenue, New York, New York,
23  before Kathleen Piazza Luongo, a
24  Notary Public of the State of New
25  York.

Page 4

1

2

3    W I L L I A M    H E N I G, called as a

4    witness, having first been duly sworn, was

5    examined and testified as follows:

6    EXAMINATION BY MR. GREENWALD:

7        Q.    Please state your name for the

8    record.

9        A.    William Henig.

10       Q.    What is your address?

11    ██          ████████████████████████████████

12    ████████████████████

13       Q.    Good morning, Mr. Henig.

14       A.    Good morning.

15       Q.    You are a lawyer; right?

16       A.    Correct.

17       Q.    Have you ever been deposed

18    before?

19       A.    No, I haven't.

20       Q.    So at this deposition I'm going

21    to ask questions, you answer the

22    questions, we have a court reporter,

23    please wait until I complete my question

24    before you start your answer.

25       A.    Okay.

Page 5

1      HENIG - PRIVILEGED - CONFIDENTIAL
2         Q.    And I'll do my best for you to
3    wait for you to complete your answer
4    before I ask the next question.
5         A.    Okay.
6         Q.    If I ask a question that you
7    don't understand please ask me to clarify
8    or rephrase the question and I'll
9    endeavor to do so.
10        A.    Okay.
11        Q.    Is that understood?
12        A.    Yes.
13             MR. KIRSCHENBAUM:  Marc, is
14        this deposition being recorded by any
15        means other than the stenographer?
16             MR. GREENWALD:  No.
17             MR. KIRSCHENBAUM:  Okay.  Thank
18        you.
19        Q.    So if you answer a question
20    that I ask without asking me to rephrase
21    or clarify I'm going to assume that you
22    understood the question; is that fair?
23        A.    Yes, it is.
24        Q.    When did you graduate from law
25    school?

1      HENIG - PRIVILEGED - CONFIDENTIAL

2      A.     May 2005.

3      Q.     And you took the Bar after

4   that?

5      A.     Yes.

6      Q.     The New York Bar?

7      A.     Yes.

8      Q.     And you passed?

9      A.     Yes.

10      Q.     And you became licensed in the

11   State of New York?

12      A.     Yes.

13      Q.     Why did you do that?

14      A.     In order to practice law in the

15   State of New York you must go through the

16   licensing process.

17      Q.     And then have you kept your

18   license since then?

19      A.     Yes.

20      Q.     Why did you keep your license?

21      A.     That is my active career and

22   source of income.

23      Q.     What does it mean to practice

24   law?

25              MR. KIRSCHENBAUM:  Objection.

Page 15

```
 1     HENIG - PRIVILEGED - CONFIDENTIAL
 2   I were to be using my resume now I would
 3   not put it on my resume.
 4       Q.    It has been on your resume;
 5   right?
 6       A.    It has been on my resume when I
 7   applied to other projects with Providus,
 8   maybe some other agents, head hunting
 9   firms I put down.
10       Q.    So you applied with other
11   agencies after you worked at Quinn
12   Emanuel?
13       A.    UM, I actually don't believe I
14   did.  There was one project that I did
15   with Providus that Kush Bambrah,
16   obviously you know who he is, but he was
17   the headhunter, after I was dismissed --
18   after I was terminated from the Quinn
19   Emanuel project Kush Bambrah offered me a
20   paper project that was done with Hess
21   Oil, it was just for a week, and after
22   that I never applied for another project.
23       Q.    And you said you applied with
24   other providers?
25       A.    Prior to -- prior to, um, the
```

Page 19

1     HENIG - PRIVILEGED - CONFIDENTIAL

2        A.    Yes.

3        Q.    And you've produced this copy

4   in discovery in this lawsuit; correct?

5        A.    Yes.

6        Q.    And is everything in this

7   resume accurate?

8        A.    Yes.

9        Q.    Why did you create this resume?

10       A.    I created it for the purposes

11   of applying for document review positions

12   after I was employed with Quinn Emanuel

13   as a document reviewer.

14       Q.    Now, when you applied to

15   Providus to work on the Quinn Emanuel

16   document review project you were aware

17   that they were looking for attorneys;

18   correct?

19            MR. KIRSCHENBAUM:  Objection.

20       A.    That is, um, that was -- that

21   was made very explicit in the -- in the

22   job offer so, yes, I was aware.

23       Q.    And did you have an

24   understanding of why Quinn Emanuel and

25   Providus wanted attorneys for the

Page 20

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   project?
 3              MR. KIRSCHENBAUM:  Objection.
 4      A.    It was not -- obviously it was
 5   not explicitly explained in the job offer
 6   but being that they were searching for
 7   what they called attorneys I submitted my
 8   resume.
 9      Q.    And you are an attorney; right?
10      A.    That's correct.
11      Q.    You completed conflict checks
12   with Quinn Emanuel; right?
13      A.    Yes.
14      Q.    What is a conflict check?
15      A.    A conflict check is required
16   by the attorney rules of ethics and to
17   ensure that there is no conflict of
18   interest present with any of the
19   attorneys that are -- or the law firms
20   that are representing our client.
21      Q.    What is a conflict of interest?
22              MR. KIRSCHENBAUM:  Objection.
23      A.    Conflict of interest is a very
24   lengthy -- requires a very lengthy
25   definition; but I assume for, I mean, is
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   this an open-ended question, Mr.
 3   Greenwald?
 4      Q.    You should answer it as best
 5   you can.
 6      A.    In the practice of law in
 7   New York State a conflict of interest is
 8   present when an -- when an attorney has
 9   adverse interests -- has, um, opposing
10   interests to his clients and one of the
11   things that can be in a conflict of
12   interest is the attorney has represented
13   an opposing -- has represented an
14   opposing client or has worked for an
15   opposing law firm.
16      Q.    And you learned about conflicts
17   of interest in law school; right?
18      A.    Yes.
19           MR. GREENWALD:  Please mark
20      this as Exhibit 2.
21           (Whereupon, the above-mentioned
22      document bearing Bates numbers
23      00212003 - 004 was marked Exhibit 2
24      for identification.)
25      Q.    I'm showing you what has been
```

Page 22

1      HENIG - PRIVILEGED - CONFIDENTIAL

2    marked as Exhibit 2.

3              Do you recognize this document?

4       A.    Yes.

5              Well, actually let me think.

6    Let me just look it over, please.

7       Q.    Of course.

8              (Witness peruses Exhibit 2.)

9       A.    Yes, I believe I vaguely

10   remember it.  I'm not sure if I filled it

11   out when I was interviewed or when I was

12   applying online.  But seeing a scan --

13   seeing a signature, that looks like a

14   scan from my machine, I have a scanner,

15   so I think I did this from home, pretty

16   sure.

17      Q.    Exhibit 2 is a document you

18   created?

19      A.    It was the blank template was

20   provided to me when I was applying.  To

21   the best of my recollection I filled this

22   out at home and, you know, based on to

23   the, uh, on the boilerplate template.

24      Q.     You provided the narrative

25   information contained in the document;

1      HENIG - PRIVILEGED - CONFIDENTIAL

2    correct?

3         A.    Yes.

4         Q.    And you signed it on or about

5    August 12, 2012; correct?

6         A.    Yes.

7         Q.    That's your signature appearing

8    on page 2 of the document?

9         A.    Yes.

10        Q.    And you checked the box

11   "attorney" under "position" on page 1;

12   correct?

13        A.    Yes.

14        Q.    That's the position you

15   understood you were going to be working

16   as a contract lawyer; correct?

17        A.    Um, that's what it was called,

18   yes, but I could also add that, you know,

19   I was going to be -- it was for -- I mean

20   this looks -- I mean the way this was set

21   up it makes it look like it's some sort

22   of, um, that it's used for every single

23   person applying for attorney at Quinn

24   Emanuel and, you know, I went in with the

25   knowledge knowing that a document

1      HENIG - PRIVILEGED - CONFIDENTIAL

2   reviewer is not a full attorney.

3      Q.    What do you mean by "full

4   attorney"?

5      A.    Was not really an attorney

6   position at Quinn Emanuel.

7      Q.    You knew that Quinn wasn't

8   going to be your employer; right?

9           MR. KIRSCHENBAUM:  Objection.

10     A.    Actually I did not know until --

11  until, um, after back and forth with

12  Providus, I wasn't aware of that.

13     Q.    I don't understand what you are

14  saying when you said you knew that you

15  weren't going to be a full attorney.

16     A.    I knew I was going to be a

17  document reviewer.

18     Q.    But you understood that you had

19  to be a lawyer to be a document reviewer;

20  right?

21          MR. KIRSCHENBAUM:  Objection.

22     Asked and answered.

23     A.    I -- I knew I was -- that that

24  was the prerequisite for them to even

25  review your resume, you had to be, the

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2    job offer said only -- only licensed
 3    attorneys can apply.
 4        Q.    So what's the distinction you
 5    are drawing about full attorney or not
 6    full attorney?
 7        A.    Um --
 8            MR. KIRSCHENBAUM:  Objection.
 9        A.    Yeah, it's, uh, the people who
10    are applying for these positions are
11    aware -- fully aware that they are not
12    applying for a full what's called
13    associate position in Quinn, in Quinn
14    Emanuel, it's a document review
15    position.
16        Q.    So that has to do with chances
17    for -- chances for advancement within the
18    firm; correct?
19        A.    It's known full well that there
20    is no chance for advancement in the firm
21    from a document review position.
22        Q.    Document reviewers are
23    sometimes hired as go from agency
24    employees to Quinn Emanuel employees;
25    right?
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2        just wanted to clarify that.

3               MR. GREENWALD:  I'm not saying

4        there was anything improper.  I just

5        asked the question to reflect the

6        fact.

7               MR. KIRSCHENBAUM:  Reflect that

8        there was no question pending.

9    CONTINUED EXAMINATION BY MR. GREENWALD:

10       Q.    I'm showing you what has been

11   marked as Exhibit 3?

12       A.    Yes.

13       Q.    Do you recognize this document?

14       A.    Um, there are several documents

15   that I signed but, uh, is this the

16   contract?  Yes, I do -- I do remember it.

17       Q.    What is Exhibit 3?

18       A.    I believe it's the contract

19   that set the terms of my employment with

20   Quinn Emanuel.

21       Q.    Okay.

22       A.    Even says agreement in the

23   first two words.

24       Q.    On the second page of the

25   document, is that your signature?

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2         A.    Yes.
 3         Q.    Did you sign this contract on
 4   or about the fifteenth day of August,
 5   2012?
 6         A.    Yes.
 7         Q.    Is that your handwriting on the
 8   third page with emergency notification
 9   information?
10         A.    Yes.
11         Q.    Is that your signature on the
12   fourth page regarding temporary employee
13   acknowledgment form?
14         A.    Yes.
15         Q.    Is that your signature on the
16   sixth page regarding the procedures for
17   document review project?
18         A.    Yes.
19         Q.    As well as your initials in the
20   middle of the sixth page?
21         A.    Yes.
22         Q.    So going back to my original
23   question, were you told that you were
24   going to be performing legal services?
25         A.    May I have a moment to review
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   this?
 3        Q.     Yes.
 4               (Witness peruses Exhibit 3.)
 5               MR. KIRSCHENBAUM:  Just to be
 6        clear, are you asking him if this
 7        document refreshes his recollection
 8        or are you just asking him the same
 9        question over again?
10               MR. GREENWALD:  Same question.
11               MR. KIRSCHENBAUM:  Then I'm
12        going to object that it was asked and
13        answered.
14        A.     Okay.  So my question here with
15   Providus, in signing the written contract
16   with Providus, um, there is a, um, there
17   is language I see on the second page, it
18   says you acknowledge that the legal
19   services you provide, so it's kind of
20   buried in the sentence there, um, so to
21   the extent that this contract states was
22   I aware of?  I guess the contract speaks
23   for itself.
24        Q.     You were told that you would be
25   performing legal services on this
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   project; correct?
 3      A.    To the extent that the contract
 4   states it.
 5      Q.    And you signed the contract;
 6   right?
 7            MR. KIRSCHENBAUM:  Asked and
 8       answered.
 9      Q.    And it doesn't just state it
10   buried in the second page, what's the
11   first sentence of the contract say?
12      A.    Oh, okay, "The terms and
13   conditions of which you perform legal
14   services for our client," and I'm going
15   to object to the language there because
16   Quinn Emanuel was not our client, ▮▮▮
17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   ▮▮▮▮▮▮▮▮▮ is our client, so it's not
19   even a correct, properly drafted
20   contract.
21      Q.    You were informed in advance of
22   doing the work that you were performing
23   legal services; correct?
24            MR. KIRSCHENBAUM:  Objection as
25       the question being asked probably for
```

1     HENIG - PRIVILEGED - CONFIDENTIAL

2        the fifth or sixth time.

3        A.    As I said, to the extent that

4     it's written here in the contract.

5        Q.    And so your answer before when

6     you said, no, I wasn't informed was

7     wrong; correct?

8        A.    Not before -- not in any other

9     manner.

10       Q.    What do you mean "not in any

11    other manner"?

12       A.    No, I'll stand by that.  I mean

13    it was, I was given a contract and I

14    signed it.

15       Q.    And the contract said you will

16    perform legal services; correct?

17       A.    It says that, yes.

18       Q.    Right there in the first

19    sentence; right?

20       A.    It does.

21       Q.    And you knew that before you

22    started; right?

23       A.    Um, okay.

24             MR. KIRSCHENBAUM:  Mr.

25       Greenwald, please stop asking the

1      HENIG - PRIVILEGED - CONFIDENTIAL
2        same questions multiple times.  One
3        more time I'll just instruct him not
4        to answer.
5        A.    Okay.  I started on the
6    fifteenth, and the start date, is there a
7    document that can refresh my -- I think I
8    might have started the day before I even
9    signed it possibly.
10              I don't recall the exact start
11   date, but at some point I was provided
12   with this contract and I signed it.
13       Q.    So you were aware of the terms
14   of the contract; correct?
15       A.    Um, yes.
16       Q.    Including the first sentence;
17   right?
18       A.    I read through it, I gave a
19   peripheral reading through it.  And was I
20   an expert in the contract?  No, but I
21   read it and I signed it.
22       Q.    You were also aware of the
23   hourly rate you would be paid for your
24   services; correct?
25       A.    Just, if I could just have a

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2    and I've never exceeded the limit, so no,
 3    yes, so they do let me keep it.
 4        Q.    So what happened on your first
 5    day on this document review project?
 6        A.    Okay, so going back two years,
 7    um, walked into -- I walked into the, um
 8    -- into, okay, there was a place called
 9    the penthouse in the building on the
10    corner of I think it was right across
11    from Madison Park, it was on Fifth and
12    23rd, I don't remember the exact address,
13    and, um, we went to the very top floor,
14    there was a large review room with lots
15    of computers and people just filed in and
16    sat down and eventually Kush Bambrah and
17    attorneys from Quinn came in and, um, I
18    think they gave us our assignments at
19    that point and I was -- or I'm not sure
20    if the training was first or they gave us
21    our assigned rooms, I don't remember
22    which.
23              Nonetheless, then we were
24    given -- okay, I think it was the
25    training first and then we were given our
```

 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   assigned stations and our e-mail
 3   addresses and they told us, okay, we're
 4   waiting for the docs to load and by that
 5   point it was after lunch and the docs
 6   still didn't -- I don't think they loaded
 7   at all the first day because it was
 8   backed up and then the next day, and we
 9   still stayed, I think we were let go the
10   first day because the docs weren't ready,
11   they let us go around five or six and the
12   second day I think the documents were
13   ready and we started reviewing through
14   the documents on Relativity.
15      Q.    What kind of training did you
16   have?
17      A.    It was a few hours.  They gave
18   a brief overview of the litigation, they
19   explained to us, an attorney from Quinn
20   Emanuel explained to us, um, explained
21   about, um, ███████████████████████ and
22   other, um, issues pertaining to that
23   which really I didn't really have any
24   background in, I still didn't really
25   understand it after the brief training;

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   and then, um, they gave us some training
 3   materials and guide books which we were
 4   to reference during our review and then
 5   we went to our stations and were told to
 6   start.
 7        Q.    Let me step back just in time.
 8              I don't think I asked how you
 9   found out about the document review
10   project in order to apply.
11        A.    I received an e-mail blast from
12   Providus, I guess they had my name, I
13   don't know how, maybe at some point they
14   had received my -- I had gone to their
15   website and put my e-mail address in and
16   geographical information and after
17   receiving that blast I applied.
18        Q.    And then were you interviewed
19   live and in person by anyone?
20        A.    Yes, by a gentleman named Ken
21   Tanzer.
22        Q.    What happened at that
23   interview?
24        A.    It was very congenial.  He
25   glanced at my resume and I think it was
```

1    HENIG - PRIVILEGED - CONFIDENTIAL

2       what you already got.

3             I will allow you to ask the

4       question one more time.  If you ask

5       it again after that I will instruct

6       him not to answer and call the Court.

7       A.    I don't know what was done

8    behind closed doors outside of my

9    presence from the time I gave the

10   interview and from the time he set eyes

11   on my paperwork until -- leading up until

12   the time I received the you are hired

13   e-mail.

14            So from your question, yes,

15   there is definitely much that could have

16   been done in regards to whether -- in

17   regards to the substance of this

18   litigation.

19      Q.    Substance of which litigation?

20      A.    This lawsuit against Quinn

21   Emanuel, my lawsuit against Quinn

22   Emanuel.

23      Q.    You said on the first day you

24   were given training about Quinn Emanuel's

25   client's lawsuits; correct?

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2          A.     Yes.
 3          Q.     And showing you what has been
 4      marked as Exhibit 5, is this one of the
 5      documents that you were given as part of
 6      that training?
 7          A.     Yes.
 8          Q.     And was a presentation made by
 9      a Quinn Emanuel associate regarding the
10      cases?
11          A.     Yes, by PowerPoint and by
12      lecture.
13          Q.     Now, you see that this
14      document, Exhibit 5, is labeled at the
15      bottom privileged and confidential
16      attorney work product?
17          A.     Yes.
18          Q.     Every page, right?
19          A.     Yes.
20          Q.     Did you have an understanding
21      of what that meant when you saw this back
22      in August of 2012?
23          A.     Yes, I did.
24          Q.     What does that mean?
25          A.     It means it cannot be divulged
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2       pad and we will mark it as an exhibit.
 3            MR. KIRSCHENBAUM:  Here's a
 4       pad.
 5            MS. SUTTON:  We can get you a
 6       full legal pad in case you need it.
 7            THE WITNESS:  Can I write on
 8       this?
 9            MS. SUTTON:  If we're going to
10       mark it as an exhibit it would seem
11       easier to get you a full legal pad.
12            THE WITNESS:  Okay.
13            (Whereupon, a brief recess was
14       taken.)
15            THE WITNESS:  What's the
16       question?
17            MR. GREENWALD:  Read back the
18       question, please.
19            (The requested portion of the
20       record was read.)
21       A.    Oh, okay.  Yes, there is.
22       Q.    And what is that?
23       A.    There is a list of names and
24     cases that I, actually and these tables
25     and chart, and there is a tag table that
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2   was referenced to extensively.  In fact

3   these documents were almost like our

4   bible.  There were a bunch of others

5   given but this was the first of them and

6   we would refer to them exhaustively in

7   tagging.

8        Q.    And so it's page 21 of Exhibit

9   5 that you are referring to?

10       A.    Yes.

11       Q.    And your contention is it's

12  page 21 of Exhibit 5 --

13       A.    Oh, I'm sorry, I'm going to

14  rephrase.

15       Q.    Okay.

16       A.    It was not only page 21.  There

17  were other tables that you have here, um,

18  and list of names that we would review.

19  So 21 is part of it.

20            It's page 23, 24, I mean

21  wherever there were charts we would -- we

22  would do it.  Page21 was definitely very,

23  uh, very useful chart.

24       Q.    And so let's start with page

25  21.

1      HENIG - PRIVILEGED - CONFIDENTIAL

2         A.      Okay.

3         Q.      Your contention is page 21 told

4    you not to use any judgment?

5                 MR. KIRSCHENBAUM:  Objection.

6         A.      Did page 21 tell us not to use

7    judgment?  I -- I -- we were trained, the

8    main expectation once we were in the

9    thick of everything was to tag responsive

10   and nonresponsive and, um, and the basis

11   for that was based on what the -- these,

12   uh, what the key trigger words and the

13   sources of the documents.

14        Q.      There is an explanation next to

15   the word "responsive," right?

16        A.      There is some language there.

17        Q.      Did you read that at the time?

18        A.      Yes.

19        Q.      It doesn't say look for names

20   and if the name appears put it in the

21   responsive category, does it?

22        A.      We were not trained to, uh, to

23   know what all the documents were by rote.

24   We would have to constantly refer to just

25   to see if a -- if a keyword was there.

Page 83

1      HENIG - PRIVILEGED - CONFIDENTIAL

2          Q.     My question is the explanation

3      of responsive contained on 21.

4          A.     Yes.

5                 MR. KIRSCHENBAUM:  Is that a

6          question or a statement?

7          Q.     I'm focusing you on that.  Are

8      you looking at that?

9          A.     Yes.

10         Q.     Does that say anything about

11     looking for the presence of a name and

12     marking it responsive if the name is

13     there?

14         A.     There it does not say that.

15         Q.     You would agree with me that

16     the explanation is use this tag for

17     documents responsive to Defendant's

18     request for production limited by ███████

19     objections; correct?

20         A.     That's what it says there.

21         Q.     And to do that you would have

22     to understand what the Defendant's

23     requests for production were and what

24     ███████  objections are; right?

25                MR. KIRSCHENBAUM:  Objection.

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2      A.     No.
 3      Q.     No?
 4      A.     We did not have to understand.
 5      Q.     You were given the Defendant's
 6   requests for production; right?
 7      A.     You are talking about the
 8   discovery demands or what's in this
 9   training material?
10      Q.     You were given Defendant's
11   requests for production; right?
12             MR. KIRSCHENBAUM:  I believe he
13      asked you for a clarification.
14      Please answer.
15      A.     Do you have an example of that?
16   Because I don't -- I don't completely
17   recall.
18      Q.     So you don't recall whether or
19   not you were given the requests for
20   production?
21      A.     Um, if you don't mind, is a
22   request for production the same as a
23   discovery demand, like a document demand?
24      Q.     Were you given document
25   demands?
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2      A.     We were definitely given a lot
 3  of pleadings, I recall.  It's possible we
 4  were given, I don't remember.  If there
 5  is anything that you have that would
 6  refresh my recollection that would
 7  assist.
 8      Q.     Why were you giving pleadings
 9  if you were just looking for keywords and
10  documents?
11             MR. KIRSCHENBAUM:  Objection.
12      A.     I think they gave us copies of
13  what they, uh, that would pertain to the
14  litigation, but we didn't have to use it
15  at all.
16      Q.     You spent time reading them;
17  right?
18      A.     I glanced over them.
19      Q.     You billed the client for
20  reading them; right?
21             MR. KIRSCHENBAUM:  Objection.
22      A.     I don't think so, no.  Billing
23  the client, this job here, they expected
24  us to tagging.
25             MR. KIRSCHENBAUM:  Is there a
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2      Q.     So were the tables on page 21

3   and the following pages your bible in

4   doing the review?

5      A.     All the tables that were given

6   to us, and there were many of them, and

7   the list of names were very useful, yes,

8   they were.

9      Q.     So how can you tag something

10  responsive or not responsive unless you

11  know what the requests for production

12  are?

13     A.     Because responsive documents

14  things were -- responsive documents were

15  -- there were often keywords that were

16  highlighted in the Relativity that made

17  it obvious they were responsive.

18          Things that were not responsive,

19  it was very clear that they were, again,

20  we were given very high expectations to

21  plug through lots of documents in a

22  limited amount of time.

23          It came to the point they

24  wanted us to do almost one document a

25  minute, and things that were not

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   responsive were clearly publicly
 3   available publications that were given
 4   to ███████ and people in the industry.
 5   They were very esoteric, um, charts and
 6   graphs.  There were hundreds and hundreds
 7   of those that someone without any
 8   preexisting knowledge or with a three-
 9   hour training could not possibly
10   decipher, um.
11             Things that were tagged as
12   responsive often had -- were -- came from
13   e-mails and the list of names that you
14   gave us, or to those people, um, and/or
15   were involved with the, uh, cross-
16   reference with these, um, with these
17   charts.
18       Q.    A computer could look for
19   search trends; right?
20       A.    I suppose it could, yes.
21       Q.    And it did, it gave you
22   documents that were selected based on
23   search trends; right?
24       A.    Honestly, I have no idea how
25   they were selected.  At the beginning of
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2    a day, of a shift, we would be given a

3    list of batches, I believe, and you would

4    just randomly select one and then the

5    documents would pop up on Relativity.

6              I don't know how they were

7    preselected.  I have no idea.

8        Q.    And the documents, the computer

9    could highlight terms in the document;

10   right?

11       A.    It frequently did, yes.

12       Q.    So whether or not a term was

13   present in a document computer, you

14   already knew that before you even looked

15   at it; right?

16       A.    Yes.

17       Q.    So your job must have been

18   something different than determining

19   whether or not there was a term in the

20   document; right?

21             MR. KIRSCHENBAUM:  That's a

22       statement.  Are you asking a question?

23       Q.    Right.

24       A.    Is that a question?

25       Q.    Yes.

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2      A.     Often it wasn't.
 3      Q.     Why not?
 4             MR. KIRSCHENBAUM:  Objection.
 5      A.     Often the computer already
 6   pretty much, right, was able to highlight
 7   the -- the, uh, responsiveness of the
 8   document and by immediately visualizing
 9   the highlighted, I think it was yellow
10   highlighting, I would click responsive.
11      Q.     But the computer didn't put it
12   in the responsive category, you would
13   have to look at the document and look at
14   the yellow highlighted terms to make some
15   kind of determination; right?
16             MR. KIRSCHENBAUM:  Objection.
17      A.     Um, it did not take much
18   thought.
19      Q.     So you were bored by the job?
20      A.     Extremely.
21      Q.     So why didn't you quit?
22      A.     As I stated, I needed money, as
23   did every other human being.
24             MR. KIRSCHENBAUM:  If that was
25      the reason I'd quit this deposition.
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2        Q.     You were also reviewing for
 3    besides responsiveness and not
 4    responsiveness you were reviewing for
 5    privilege; right?
 6        A.     Yes, I was.
 7        Q.     What is privilege?
 8               MR. KIRSCHENBAUM:  Objection.
 9    Calls for a legal conclusion.
10        A.     Do you want me to say what --
11    are you asking me to educate you about
12    what privilege is or do you want to know
13    what they decided what we were supposed
14    to tag as privileged?
15        Q.     What is privilege?
16               MR. KIRSCHENBAUM:  Objection.
17        A.     Privilege is in the -- I mean,
18    outside of this project my knowledge of
19    privilege was things that cannot be
20    divulged to anyone expect the attorney
21    and the client.
22        Q.     You were reviewing
23    internal documents; right?
24        A.     They were not all internal,
25    many of them were.
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2          Q.     You were reviewing █████████

3    internal documents; right?

4          A.     Of the documents I reviewed,

5    yes, it did include ████████  internal

6    documents.

7          Q.     Who else's documents did you

8    review?

9          A.     There were many publicly

10   available documents, as I stated, that,

11   again, I don't have extensive knowledge.

12   My expertise is in family -- New York

13   State family/matrimonial law.

14              Many of the documents were

15   publicly available to people in the

16   ████████████████████████████████████████

17   industry.

18         Q.     They were found within ████████

19   possession --

20         A.     Yes.

21         Q.     -- and they were being reviewed

22   to determine whether they would be turned

23   over as part of the lawsuit; right?

24         A.     Yes.

25         Q.     And one of your jobs that you

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   understood was to determine whether or
 3   not the documents that you were reviewing
 4   were privileged; right?
 5        A.    Yes.
 6        Q.    And what process did you go
 7   through to determine that?
 8        A.    Many of the documents had --
 9   had titles, like such as this one,
10   privileged and confidential, and they
11   were highlighted and that was a quick
12   giveaway.
13            When there was e-mails one of
14   the first things I would check was
15   whether it was from the list of attorneys
16   that was disseminated to the document
17   reviewers, one of those names, um, came
18   up, I would immediately tag it as
19   privileged.
20        Q.    And what about if you saw a
21   document that was written by a lawyer but
22   sent outside of      ?
23            MR. KIRSCHENBAUM:  Objection.
24        A.    I was always was erred on the
25   side of caution and I would tag those as
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2   Let me read it first, please.

3              (Witness peruses Exhibit 6.)

4      A.     Okay.  Okay.  Do I remember

5   receiving this?

6      Q.     Yes.

7      A.     Honestly, I don't remember.

8      Q.     You were on the first level

9   review team; correct?

10     A.     Yeah.

11     Q.     And you knew who Andrew

12  Kutscher was; right?

13     A.     Uh, I think with he was one of

14  -- I think, I honestly don't remember.

15  But I -- I don't remember.  I really

16  don't.

17     Q.     And do you see the instructions

18  he gave at 1:29 p.m.?

19     A.     Yes.  It's possible I wasn't

20  there.  I mean, I would have to check if

21  that was a Jewish holiday, if it was then

22  I got it, you know, I got it when I came

23  back a few days later.

24              I mean, if it was sent then I'm

25  not going to dispute that I received it

1     HENIG - PRIVILEGED - CONFIDENTIAL

2   because I was on the e-mail list.

3       Q.    And you received e-mail

4   instructions about the review from time

5   to time; right?

6       A.    Yeah.

7       Q.    And do you see that it says "if

8   you see and know that priv has been

9   broken you may now reframe from tagging

10  priv"; do you see that?

11      A.    Oh, okay.

12            Well, obviously they had to

13  make that -- they had to specify that.

14      Q.    Did you understand what that

15  meant?

16      A.    Um, I really don't remember

17  this e-mail, so from reading it now, um,

18  I do understand what it means.

19      Q.    What does it mean?

20      A.    What he says, he explains

21  himself.  He says that if it is sent to

22  someone outside, it went outside to the

23  ███████ or ███████ or their attorneys and

24  consultants you can skip the priv tag, so

25  that's what it means.

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2         Q.     That would mean that the
 3   document would have the name of the
 4   attorney in it; right?
 5         A.     It should.
 6         Q.     And yet you are not going to
 7   mark it privileged despite the presence
 8   of the name of the attorney; right?
 9         A.     That's what he wanted, that's
10   what he instructed, but it doesn't mean
11   that I got batches of documents that
12   pertained to these instructions.
13         Q.     Did you follow the
14   instructions?
15         A.     I always followed the
16   instructions to the best of my ability.
17   But, again, there's instructions and
18   often these little e-mail blasts but, um,
19   from the e-mails -- from the Relativity
20   documents it wasn't always so -- it
21   wasn't always made -- I'm just gonna --
22   it wasn't always -- we didn't always get
23   things that fell under what he was --
24   what he was talking about.
25         Q.     But if you saw a document that
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   asking me how I, really I just went by
 3   if -- if it was outside ███ or the ████
 4   you have to go by what was at the end of
 5   their e-mail address, so it doesn't
 6   require much analysis.
 7        Q.    It would require some analysis
 8   then?
 9             MR. KIRSCHENBAUM:  Objection.
10        A.    Just to read an e-mail address.
11        Q.    And know whether or not they're
12   a consultant; right?
13        A.    There's no way someone could
14   know that the person is a consultant
15   unless there is a list of names given.
16   If that's not given someone who have to
17   ask a supervisor.
18        Q.    You were encouraged to ask
19   supervisors if you had questions; right?
20        A.    I did frequently and frequently
21   they didn't know themselves.
22        Q.    And so there were times that
23   you marked documents I can't tell whether
24   or not this is privileged; right?
25        A.    A few times.
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   I did read that in the charts and it said
 3   to use your discretion, but it was never a
 4   big, uh, focus.
 5        Q.    Just going back to Exhibit 5.
 6        A.    Exhibit 5, yes?
 7        Q.    And the chart on page 19 --
 8   sorry, not 19 -- the chart on page 21.
 9        A.    Um hum.
10        Q.    That's what you described as
11   one of your bibles; right?
12        A.    Definitely was useful.
13        Q.    It asked you to tag documents
14   as key docs; right?
15        A.    It definitely see it listed
16   there.
17        Q.    What was a key doc?
18        A.    Honestly, I don't know.
19        Q.    But you got instructions on it,
20   right?
21        A.    It was not reasonably expected
22   for us to use that tag.  Quite honestly,
23   frankly I don't believe I ever did.
24        Q.    What do you mean it was not
25   reasonably expected for you to use that
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   CONTINUED EXAMINATION BY MR. GREENWALD:
 3      Q.    Okay.  Are you done being
 4   coached by Mr. Kirschenbaum?
 5      A.    I wouldn't call it coaching.
 6      Q.    What would you call it?
 7            MR. KIRSCHENBAUM:  Who cares.
 8            If you have a problem with the
 9      Federal Rules you might want to take
10      it up with the drafters.
11      Q.    Did you ever tell any
12   supervisors that you didn't have time to
13   follow the instructions in your tagging
14   bible?
15      A.    No.
16      Q.    So your supervisors thought you
17   were following the instruction to tag key
18   docs sparingly but if you saw one to tag
19   it; right?
20      A.    I don't know what was in their
21   minds.
22      Q.    Did you give them any reason to
23   believe you weren't following the
24   instructions you were given?
25      A.    No.
```

```
 1        HENIG - PRIVILEGED - CONFIDENTIAL
 2        Q.     Did anyone tell you not to
 3    follow the instructions you were given?
 4        A.     Any other attorneys or --
 5        Q.     Anyone on the Quinn Emanuel --
 6        A.     Absolutely.
 7        Q.     Who told you not to follow the
 8    instructions?
 9        A.     They didn't say don't follow
10    the instructions, but there were
11    experienced reviewers there who said they
12    had their own little system, not that I
13    followed it, but, you know, people had
14    their little ways of maybe manipulating
15    things.
16        Q.     Who told you that --
17               MR. GREENWALD:  Well, strike
18        that.
19        Q.     Did anyone tell you not to
20    follow the instructions?
21        A.     No.
22        Q.     So now you said people told you
23    that they had ways of manipulating
24    things?
25        A.     There was one reviewer that
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2    level review team.  I'm not sure which

3    documents were being reviewed.

4        Q.     Maybe your documents were in a

5    queue and were going to get reviewed

6    later; right?

7        A.     Possibly, but it would have

8    been nice to know whether I was doing

9    something right or wrong.

10       Q.     Did you ask your supervisors?

11       A.     I tried to ask the supervisors

12    in the room occasionally questions and

13    quite often they were as clueless as I

14    was.

15       Q.     Who did you ask questions of?

16       A.     There was a gentleman, I don't

17    remember these names, there was a guy

18    named -- I can't remember his name -- I

19    have to, I'm sorry, I have to get back to

20    you.  I'd have to really --

21       Q.     What did you can ask him?

22       A.     I would ask is this responsive

23    or nonresponsive and the person would say

24    I'm not sure but I usually hit responsive

25    on those types of documents.

```
1        HENIG - PRIVILEGED - CONFIDENTIAL
2        Q.    And did you ask a follow-up
3    question?
4        A.    No.
5        Q.    Did you explain why you were
6    not sure whether or not it was responsive
7    or not responsive?
8        A.    I didn't say the reason, I just
9    wasn't sure.
10       Q.    And did you learn anything from
11   the conversation with the supervisor?
12       A.    No.
13       Q.    Could you have asked a
14   follow-up question:  All right, well, my
15   concern was about whether it had to do
16   with ███████████████████?
17            MR. KIRSCHENBAUM:  Objection.
18       That's a hypothetical question.
19       A.    I didn't do that because I
20   wasn't -- I didn't understand -- I wasn't
21   knowledgeable enough about any of this, I
22   was really just plodding along in the
23   dark.
24       Q.    Now, if you look at Exhibit 5
25   on the last page?
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2         A.     Exhibit 5 on the last page,
 3    yeah.
 4         Q.     You were provided with a lot of
 5    documents; right?
 6         A.     Yes.
 7         Q.     You were provided with
 8    Complaints; right?
 9         A.     I was provided with whatever
10    was listed there.  Um, yeah, Complaints
11    are listed.
12         Q.     Did you read them?
13         A.     I think I glanced over them.
14         Q.     Why did you only glance over
15    them?
16         A.     Um, it says "for your
17    information" so it wasn't reasonably --
18    it wasn't required to determine
19    responsiveness.
20                I actually did, I think I did,
21    um, attempt to read it but once it was
22    getting very esoteric and I wasn't really
23    following a lot of the -- of the
24    pleadings, quite honestly.
25         Q.     Did you tell anyone that you
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   didn't understand the pleadings?
 3       A.    No, I didn't.
 4       Q.    Do you see at the top of this
 5   page 31 it says "Questions?"
 6            MR. KIRSCHENBAUM:  That's a
 7       statement.
 8       Q.    Do you see that?
 9       A.    I can see it says "Questions"
10   with a question mark.
11       Q.    Did you ask anyone questions?
12       A.    It doesn't say who to direct
13   any questions to, I mean obviously -- no,
14   this was not, I mean, it wasn't the, uh,
15   the document review didn't require
16   knowledge of these documents.
17       Q.    Why were you given these
18   documents?
19            MR. KIRSCHENBAUM:  Objection.
20       A.    I guess you guys would know
21   that.  I'm not sure.
22       Q.    What is your understanding of
23   why you were given these documents?
24       A.    Obviously my understanding was
25   to -- just to have a background on the
```

1      HENIG - PRIVILEGED - CONFIDENTIAL
2    the Quinn Emanuel, but he made it very
3    clear any issue, any questions, just go
4    to him.
5         Q.    Well, the training document,
6    Exhibit 5, on page 2 lists everyone's
7    telephone number and e-mail address at
8    Quinn Emanuel; right?
9         A.    Uh, it does state that there,
10   yeah.
11        Q.    So despite there being only one
12   bathroom, you could have called or
13   e-mailed any of the people on this list;
14   right?
15        A.    We weren't -- it doesn't even
16   say who to call.  I mean, there's like so
17   many attorneys there.  It just seems
18   that's, um, CYA.  It doesn't seem to me
19   like a reasonable, uh, um, support
20   network there that would come and try to
21   avail themselves to us.
22        Q.    It was Andrew Kutscher who was
23   standing in front of you --
24        A.    For the training, yeah.  I
25   guess when he was there I could have but

Page 127

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   I didn't really know what to ask even.
 3        Q.     Once you got the documents
 4   listed on page 31 you could have read
 5   them and then asked questions; right?
 6        A.     We were never, as I stated,
 7   since there was no way -- there was not
 8   really -- there didn't seem to be a care
 9   or concern whether we were reviewing
10   things correctly, um, people didn't feel
11   obligated to, uh, and then plus there was
12   the pressure, I add to that there was the
13   pressure to plug through a certain number
14   of documents and people that weren't
15   would get questions from Kush Bambrah,
16   excuse me, you know, you were supposed to
17   do a thousand documents today, you only
18   did 500.  People were scared probably to
19   ask questions.
20             MR. KIRSCHENBAUM:  While you
21        confer with your colleague I'm going
22        to confer with my client for a
23        second.
24             MR. GREENWALD:  I'm not
25        conferring with my colleague.
```

1     HENIG - PRIVILEGED - CONFIDENTIAL

2       A.    I'm talking about the training

3   materials.

4       Q.    Page 21 is the chart; right?

5           MR. KIRSCHENBAUM:  Just let him

6       answer the question.

7       A.    It's one of the charts, many

8   charts that we got and there were other

9   materials that we got.  This was not all

10  the training materials.  There were

11  several other lists of names and

12  ██████████████   and families, many like

13  voluminous lists that we would have to

14  reference when tagging responsiveness,

15  this was only the first one we got of

16  many.

17      Q.    But you were never told not to

18  follow the tagging instructions on page

19  21 of Exhibit 5?

20          MR. KIRSCHENBAUM:   Objection.

21      Asked and answered.

22      A.    No, I mean.

23          MR. KIRSCHENBAUM:  I want to

24      point out for the record that Mr.

25      Greenwald has literally been asking

1    HENIG - PRIVILEGED - CONFIDENTIAL

2       the same questions like five to ten

3       times over the course of the

4       deposition.

5              THE WITNESS:  You'll have to

6       ask it again or repeat it.

7              (The requested portion of the

8       record was read.)

9       A.    Not by any staff supervisors,

10   no.

11      Q.    By anyone, right, you were not

12   told not to follow by anyone?

13             MR. GREENWALD:  Strike that.

14      Too many negatives.

15      A.    The time constraints we were

16   given rendered it impossible to -- to,

17   uh, to review documents to determine

18   whether any of these sub-tags applied.

19      Q.    Let's talk about the time

20   constraints, what time constraints were

21   you under?

22      A.    In the beginning, I know that

23   it came to a point within a week or two

24   that they wanted us doing something like

25   a document per minute, between five and

1    HENIG - PRIVILEGED - CONFIDENTIAL

2       what he is been marked as exhibits 8

3       and 9.

4       Q.    Do you recognize these two

5    documents?

6       A.    Eight I definitely recognize

7    and I do recall referring to it and, 9 --

8    9 is more vague.  It's -- I guess I may

9    have received it but I don't think it was

10   something I referred to as extensively as

11   8 and especially, you know, the main

12   packet, 5.

13      Q.    And did you follow this doc

14   review guidance in Exhibit 8 when you

15   were doing your review?

16      A.    To the best of my ability.

17           MR. KIRSCHENBAUM:  I'm just

18      going to note for the record that the

19      Plaintiff has not been given enough

20      time to read the entire document.

21      Q.    Do you need more time?

22      A.    No, that's okay.  That's fine.

23      Q.    Do you see that page 4 of

24   Exhibit 8 refers to confidentiality?

25      A.    Page 4, confidentiality.  Okay?

Page 145

1      HENIG - PRIVILEGED - CONFIDENTIAL

2          Q.      And did you understand that one

3    of your roles was to determine whether or

4    not to keep the confidentiality

5    designation on the documents?

6          A.      Based on what this says, yeah.

7    This was never -- see, we would get

8    these -- these packets, but they were

9    never explained and part of education is

10   to require the purveyor of the -- of the

11   materials to explain, that's how I was

12   educated in college and law school,

13   otherwise we would just buy a bunch of

14   law books and become attorneys, which is

15   not possible.

16         Q.      Did you not understand the

17   instructions?

18         A.      We definitely -- I mean I was

19   definitely able to understand to the

20   extent of my reading it but these are

21   things that would have required expert

22   clarification and instruction and we

23   didn't get that.

24              (Counsel and witness confer off

25       the record.)

1    HENIG - PRIVILEGED - CONFIDENTIAL

2              MS. SUTTON:  They did consult

3       for the record.

4              THE WITNESS:  No, actually,

5       there was nothing said in my hearing

6       comprehensibly.

7              MS. SUTTON:  I don't understand

8       what it means if you are going to

9       speak and then he says it's not

10      consulting because it's not

11      comprehensive.

12             THE WITNESS:  It's not

13      comprehensible.  He whispered

14      something and I didn't hear it and I

15      said do you want to consult and he

16      said no.

17   CONTINUED EXAMINATION BY MR. GREENWALD:

18      Q.    Let's move on, page 3 of

19   Exhibit 8.

20      A.    Okay.

21      Q.    Refers to something called the

22   deliberative process privilege.

23             Do you see that?

24      A.    Yes.

25             Wait, um, page 3, deliberative,

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   yes, deliberative process, okay.
 3       Q.    What is that?
 4       A.    Your guess is as good as mine.
 5       Q.    You were instructed on it.
 6       A.    No, I wasn't; I was given this
 7   document, I wasn't instructed.
 8       Q.    You were given this document
 9   that described the deliberative process
10   privilege; right?
11       A.    Yes.
12       Q.    And it uses English to describe
13   what the deliberative process privilege
14   is; right?
15       A.    I mean it attempts to explain
16   it, doesn't mean that someone without
17   extensive training or education in this
18   field, in this specialty would understand
19   what it's talking about.
20       Q.    Somebody like a lawyer?
21       A.    No, someone in the banking
22   industry.
23       Q.    And so you just ignored it
24   because you didn't understand it?
25            MR. KIRSCHENBAUM:  Objection.
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2      Q.    So you were asked to but it

3   wasn't explained at all and therefore you

4   didn't?

5            MR. KIRSCHENBAUM:  Objection.

6      That's many, many questions in one.

7            MR. GREENWALD:  You can answer

8      if you understand it.

9      A.    I was asked to do what?

10     Q.    You were asked to exercise your

11  judgment and determine whether things

12  fell within the deliberative process

13  privilege and but since it wasn't

14  explained well enough you just ignored

15  that?

16           MR. KIRSCHENBAUM:  Objection.

17     A.    I don't see judgment being used

18  here.

19     Q.    It says "To qualify for the

20  deliberative process privilege the

21  communication must be 1, about policy, 2

22  pre-decision, and, 3, ████████████████

23  ███████████████████████████████

24  ████████████████████████████████████

25  ████████████"

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2              Do you see that?
 3      A.    I see it.
 4      Q.    You have to understand whether
 5  a document would qualify under these
 6  three criteria to know whether it falls
 7  within the deliberative process
 8  privilege; right?
 9      A.    It doesn't say understand, it
10  just says what it is.
11      Q.    But it's telling you to tag it
12  as privileged if it falls within that;
13  right?
14      A.    It doesn't explain anything, it
15  doesn't explain it.
16      Q.    It doesn't explain it well
17  enough, it attempts to explain it; right?
18              MR. KIRSCHENBAUM:  Objection.
19      A.    Poorly attempts to.
20      Q.    And you never asked anyone to
21  further explain it, did you?
22      A.    There was no time.
23      Q.    Your bosses expected you to be
24  doing what they asked you to do; right?
25              MR. KIRSCHENBAUM:  Objection.
```

1     HENIG - PRIVILEGED - CONFIDENTIAL

2        A.     If I wasn't doing it, if I was

3     doing it incorrectly I would have -- I

4     would have hoped that someone would have

5     said something and no one did.

6        Q.     But you were clearly asked to

7     do this; right?

8        A.     Um, this says liberally, so I

9     guess that means that if you are not

10    doing it it falls under the definition of

11    liberal; right?  It doesn't say you must

12    use it.

13       Q.     You were asked to do this,

14    right, apply this deliberative process

15    privilege?

16       A.     By this information here it

17    seems that it should be, it says should

18    apply privilege tagging liberally, you

19    know, like when I'm putting salt on my

20    meal I could put nothing or I could put

21    tons of it, that's my understanding of

22    liberal.

23       Q.     Yes or no, you were asked to

24    review to determine whether documents

25    contained the deliberative privilege

1      HENIG - PRIVILEGED - CONFIDENTIAL

2   process?

3      A.    By this document, asked by this

4   document.

5      Q.    So that's a yes?

6      A.    It's hard for me to say yes

7   because I was the one there and no one

8   got up and said you should be doing this.

9            MR. KIRSCHENBAUM:  I think my

10      client is trying to answer the

11      question to the best of his ability.

12      You are just not getting what you

13      want.

14      Q.    They just wrote it down?

15      A.    Yes.

16      Q.    Why don't you take a look at

17   the exhibit marked as Exhibit 9.

18      A.    Oh, sure, okay.

19      Q.    Which was already given to you.

20      A.    Okay.

21      Q.    And these were also

22   instructions given to you; correct?

23      A.    Review, it says review protocol

24   updates and changes, which includes

25   instructions, yeah.

Page 159

1      HENIG - PRIVILEGED - CONFIDENTIAL

2     matter for our case, in fact it might

3     help my case because I really don't.  I

4     don't remember.

5         Q.    You just have no idea if this

6     would -- when you were actually reviewing

7     documents -- be an easy instruction to

8     follow or require reading the entire

9     document analyzing it?

10               MR. KIRSCHENBAUM:  Objection.

11         He asked and answered the question

12         and now you are attempting to argue

13         with him.

14         A.    From what I remember this is

15     one of the easiest instructions they gave

16     because it was all involving one man.

17               As you can see, many of the

18     other things are vague and elusive.

19         Q.    So the other things required

20     more judgment?

21               MR. KIRSCHENBAUM:  Objection.

22         A.    Not judgment, you just have to

23     keep looking through piles of lists and

24     charts.

25         Q.    Turn to page 2, which is still

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   the top half is still regarding first
 3   level reviewers; do you see that?
 4       A.    Yes.
 5       Q.    Under privilege it says "Use
 6   discretion marking documents Privileged."
 7   Do you see that?
 8       A.    Yes, I do is.
 9       Q.    And do you recall receiving
10   that instruction?
11       A.    Quite frankly, I don't recall.
12       Q.    Now, what does the word
13   "discretion" mean?
14       A.    Uh, I don't have a dictionary
15   handing.  Discretion, my understanding of
16   discretion is using your own individual
17   judgment, but that's only for the
18   purposes of defining it not what I
19   actually did while I was reviewing
20   documents.
21       Q.    But you would agree you were
22   instructed in writing to use your own
23   individual judgment?
24             MR. KIRSCHENBAUM:  Objection.
25       A.    I don't know if they really --
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2    if we really had to use our own judgment

3    they shouldn't have to tell us that, it

4    just proves that we were doing these by

5    rote.

6      Q.    Do you agree that you were

7    instructed in writing to use your own

8    individual judgment, yes or no?

9      A.    I agree I received this

10   document and it contains that instruction

11   even though honestly, as I said, I don't

12   -- really don't remember this document

13   too much but I'm not going to dispute

14   receiving it.  I assume that I did, that

15   you are telling the truth.

16            THE WITNESS:  Could I just ask

17       off the record, is there a lunch

18       break?

19            MR. GREENWALD:  I was hoping to

20       not go all day.

21            Let's go off the record.

22            [Discussion held off the

23       record.]

24            MR. GREENWALD:  Please mark

25       this as Exhibit 10.

1      HENIG - PRIVILEGED - CONFIDENTIAL

2    instructions you were getting were to use

3    your judgment and look for the full

4    context?

5              MR. KIRSCHENBAUM:   Objection.

6       A.    No, because the instructions

7    were just a bunch of terms.

8       Q.    Didn't you just receive an

9    instruction from Ms. ████████ right here in

10   Exhibit 10?

11      A.    Right and its terms and she

12   even calls it a list, players term list.

13      Q.    And then at the bottom she

14   says, "As always, you have to look for

15   full context"; right?

16      A.    She writes that.

17      Q.    That's an instruction; right?

18      A.    If you want to call it that,

19   you know, anything coming from someone

20   overseeing a job and telling you to do

21   something would fall under the category

22   of instruction.

23      Q.    And the instruction in writing

24   is to use your judgment and look for

25   context; right?

Page 166

1      HENIG - PRIVILEGED - CONFIDENTIAL

2              MR. KIRSCHENBAUM:  Objection.

3      A.      It says look for full context.

4      Q.      And to do that you need to

5   exercise judgment; right?

6      A.      Um, in this project we did not

7   really have to do that.

8      Q.      My question is what is the

9   instruction, not what you actually did.

10     A.      Um, I mean right, because I

11   mean there could be something that's like

12   some flyer saying ██████ that you know,

13   some ████████████████ is looking at,

14   obviously that's not relevant so, yeah,

15   you do have to look.

16              When you're crossing the street

17   you gotta look at a street sign.

18   Anything, any cognitive functioning

19   requires some sort of human judgment and

20   use of your -- of your neurons.

21              MR. GREENWALD:  Please mark

22      this as Exhibit 11.

23              (Whereupon, the above-mentioned

24      document bearing Bates number

25      QE00211211 was marked Exhibit 11 for

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   and say lawyer privileged; right?
 3      A.    Um, I mean that's a
 4   hypothetical question because I never
 5   encountered her.  Based on what, I mean
 6   ███████████     is saying that not
 7   everything she did will be -- will be
 8   privileged because she's not, even though
 9   she is on the list some things she's not
10   doing is privileged.
11      Q.    And she's telling you to read
12   the documents carefully; right?
13      A.    Yes.
14      Q.    And if a batch that you were
15   reviewing came up with ████████████████
16   documents you'd have to read them
17   carefully and determine whether or not to
18   tag them as privileged; right?
19      A.    That's what it would -- that's
20   what it's saying.
21      Q.    Doesn't that require judgment?
22      A.    Not extensive.
23      Q.    Some?
24      A.    I mean it doesn't necessarily
25   require the judgment of an attorney, um,
```

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2   to determine.
 3      Q.    Whose judgment would it
 4   require?
 5      A.    It would require, I mean anyone
 6   could see what she's talking about,
 7   anyone who could read.
 8      Q.    You did go to law school;
 9   right?
10      A.    I stated that, yeah.
11      Q.    And you studied legal
12   professional responsibility at law
13   school; right?
14      A.    Yeah.
15      Q.    Learned about the
16   attorney-client privilege; right?
17      A.    Yes.
18      Q.    So you are particularly trained
19   in attorney-client privilege; right?
20      A.    Yes.
21      Q.    So you would have more training
22   than someone who didn't go to law school
23   regarding whether or not the
24   communication was privileged; right?
25      A.    Um, obviously, yes.
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2        stating that for the record or are

3        you asking him?

4              MR. GREENWALD:  Well, I'm

5        stating it for the record right now.

6              MR. KIRSCHENBAUM:   Okay.

7        Q.     And that you wrote on the tag

8    "Looks like this could be A/C but not

9    sure of the source," and the reason I

10   have the laptop here is because if you

11   want we can go to the spreadsheet with

12   all your coding decision.

13       A.     Oh, wow.

14       Q.     And connect it to this document

15   if you would like or we can just move

16   forward.

17              So if you would like me to take

18   you through that then I can do that, or

19   you can take my representation that you

20   coded this "looks like" what did I say,

21   "Looks like this could be A/C but not

22   sure of the source"?

23       A.     Yeah, because it says

24   confidential on it so there is a trigger

25   word there.

1      HENIG - PRIVILEGED - CONFIDENTIAL

2      Q.     So you saw the word

3   "confidential."

4      A.      Right.

5      Q.      And you, but then you didn't

6   see a lawyer's name on it; right?

7      A.      Exactly.

8      Q.      And so you thought, hmm, I'd

9   better -- I'd better indicate my thought

10  process; right?

11              MR. KIRSCHENBAUM:  Objection.

12      A.      As briefly as I did.

13      Q.      Why didn't you just mark it

14  privileged and have the privileged review

15  team do it?

16              MR. KIRSCHENBAUM:  Objection.

17      That's two questions.

18      A.      What did I tag it as?  I don't

19  remember, obviously.

20      Q.      The question is why did you put

21  a note in your tag.

22      A.      Uh, because I probably -- I

23  mean, okay, I'd have to see what I tagged

24  it as to answer your question.

25      Q.      Why?

1        HENIG - PRIVILEGED - CONFIDENTIAL
2          Bates numbers produced in this
3          lawsuit.
4     CONTINUED EXAMINATION BY MR. GREENWALD:
5          Q.    So, again, there is no attorney
6     name anywhere in Exhibit 13; right?
7          A.    No, there is not.
8                MR. GREENWALD:  Please mark
9          this as Exhibit 14.
10               (Whereupon, the above-mentioned
11         document bearing Bates number
12         QE00125710 - 722 was marked Exhibit
13         14 for identification.)
14    CONTINUED EXAMINATION BY MR. GREENWALD:
15         Q.    Now, Mr. Henig, remember I
16    asked you about the deliberative process
17    privilege?
18         A.    Yes.
19         Q.    And you said you found it very
20    confusing, the instruction?
21         A.    Yes.
22         Q.    And yet you marked some
23    documents deliberative process privilege,
24    didn't you?
25         A.    Um, possibly.

1      HENIG - PRIVILEGED - CONFIDENTIAL

2       this as Exhibit 15.

3              (Whereupon, the above-mentioned

4       document bearing Bates number

5       QE00034644 - 645 was marked Exhibit

6       15 for identification.)

7              MS. SUTTON:  I can show you on

8       the screen via the spreadsheet or I

9       can also make a representation

10      regarding the coding on that.

11             Do you want me to do that

12      now, Marc?

13             MR. GREENWALD:  This is Exhibit

14      15.

15             THE WITNESS:  What was 14?

16             MR. GREENWALD:  14 was the one

17      that was deliberative process.

18             Showing you what has been

19      marked as Exhibit 15.

20             THE WITNESS:  Okay.

21             MR. GREENWALD:  Which is a

22      document you coded as key, which Ms.

23      Sutton can stand up and show you on

24      the spreadsheet the coding.

25             THE WITNESS:  Okay.

```
 1      HENIG - PRIVILEGED - CONFIDENTIAL
 2              MR. GREENWALD:  Or you can
 3        accept the representation, whichever
 4        you prefer.
 5              THE WITNESS:  Well, I really
 6        don't know why.  Honestly, I don't
 7        know why I put key.
 8              There were a few times when I
 9        may have clicked on extra buttons,
10        I'll be honest but, um.
11        Q.    What do you mean by "may have
12     clicked on extra buttons"?
13        A.    Okay.  This case I saw ██████
14     ███████, who my understanding is some big
15     wig -- big wig at the ███████, and this
16     appeared to me to be a very internal,
17     very strongly worded e-mail, just I was
18     extremely disappointed to read, this guy
19     seemed pretty angry.  This didn't seem
20     like something that should be buried.
21        Q.    And you recalled the
22     instructions that one percent of the
23     documents should be marked key; right?
24        A.    Um.
25              MR. KIRSCHENBAUM:  Objection.
```

```
 1    HENIG - PRIVILEGED - CONFIDENTIAL
 2   during the six weeks you worked on this
 3   project?
 4       A.   Okay, I really, they're pretty
 5   nice guys, I forgot their names.  Um,
 6   there was a guy with a, um, I'm sorry, I
 7   just don't remember their names.
 8            They were nice people.  They
 9   weren't that helpful but they were nice.
10   I just don't remember their names, I'm
11   sorry.  I just remember Kush Bambrah.
12            I remember some of my
13   co-workers.  Um, but there could have
14   been a guy named I think it was like a
15   French or Portuguese name, I'm sorry, I'd
16   have to think about it.
17       Q.   Okay.
18            And did anyone tell you
19   specifically not to follow the written
20   instructions you had been given?
21       A.   No one said not to follow the
22   instructions, no.
23       Q.   So you were terminated in
24   October 2012; correct?
25       A.   Yes.
```

1      HENIG - PRIVILEGED - CONFIDENTIAL

2              It was the Quinn Emanuel --

3    what's called the Quinn Emanuel team.

4       Q.    Just for the record what

5    document are you looking at?

6       A.    I am looking at Exhibit 5,

7    page 2.

8       Q.    Thank you.

9       A.    And I believe, actually no,

10   wait, these people were not involved with

11   our project, they were in the actual

12   litigation.  They weren't -- I don't

13   believe they were supervising us.

14              I don't remember their names,

15   but there were active partners, there

16   were associates who supervised us, there

17   was like two or three of them.

18      Q.    Now, paragraph 36 of your

19   Complaint says, "Plaintiff was not

20   required to and in fact could not utilize

21   any legal knowledge and/or judgment."

22              Do you see that?

23      A.    Yes.

24      Q.    Did somebody tell you not to

25   use any legal knowledge and/or judgment?

1     HENIG - PRIVILEGED - CONFIDENTIAL

2       A.    No, I just didn't have to.  It

3    wasn't on that level.

4       Q.    You saw instructions to use

5    your discretion; right?

6       A.    Um, in the written --

7             MR. KIRSCHENBAUM:  Objection.

8             Go ahead.

9       A.    In the packet I saw discretion,

10   I saw that phrase used.

11      Q.    And you didn't understand that

12   to be an instruction to use legal

13   knowledge and/or judgment?

14      A.    Um --

15            MR. KIRSCHENBAUM:  Objection.

16      A.    -- not at the time.

17      Q.    Now do you understand that you

18   were being asked to use your legal

19   judgment and/or knowledge?

20      A.    Not really, because -- no.

21      Q.    Why not?

22      A.    Because it wasn't -- the nature

23   of the work didn't require extensive

24   analysis or much of a thought process,

25   especially when there wasn't much of

1     HENIG - PRIVILEGED - CONFIDENTIAL

2    any -- any oversight and the triggers to

3    what to code the documents were very

4    almost each -- 99 percent of the time

5    were very clearly delineated on the face

6    of the document.

7        Q.    And the deliberative process

8    privilege didn't require legal knowledge

9    or judgment?

10       A.    Yeah, I mean that was just a

11   simple one, two, three, step process just

12   by identifying from the agency, which

13   was, as I said, based on the cover sheet

14   was an emblem and name and then it said

15   confidential in like bold letters and

16   then I just took a guess, I assumed two

17   out of three were there, I might as well

18   take a stab at it, that's deliberative

19   process.

20       Q.    That's not using your

21   judgement?

22       A.    No, any human being has

23   judgement.  Does it require an attorney

24   to make that little simple judgement?  In

25   my opinion, no.

1      HENIG - PRIVILEGED - CONFIDENTIAL

2        Q.     But you agree you were using

3    your judgment?

4        A.     Yes.

5        Q.     You also in this version,

6    Exhibit 19, repeated the number of the --

7    the incorrect number of hours that you

8    worked; right?

9        A.     This is the most recent Amended

10   Complaint?

11       Q.     No, this is the one your lawyer

12   sent to the Court on June 23rd, Exhibit

13   19.

14              Do you see that?

15       A.     Yes.

16       Q.     Do you see that?

17       A.     Yes.

18              What paragraph are you

19   referring to?

20       Q.     Paragraph 39.

21       A.     Let's see.  It says I was

22   required to.  Okay, required to work and

23   routinely worked.

24              So there were a few times I

25   believe, I mean maybe you are saying I

 1      HENIG - PRIVILEGED - CONFIDENTIAL

 2   as legal experience; right?

 3        A.    I did.

 4        Q.    And you represented to people

 5   who you wanted to hire you that your six

 6   weeks at Quinn Emanuel was legal

 7   experience; right?

 8        A.    I used this resume for -- I

 9   believe for our project, projects, so

10   yes.

11        Q.    To work on other document

12   review projects?

13        A.    I believe so, yes.

14        Q.    So you still wanted to work on

15   document review projects even though you

16   found it so stultifyingly boring; right?

17        A.    I did it with a very heavy

18   heart sending out these applications,

19   desperate times include desperate

20   measures.

21        Q.    Including lying on the resume?

22            MR. KIRSCHENBAUM:  Why are you

23      badgering my client for trying to

24      make 35 bucks an hour, Mr. Greenwald?

25        Q.    Yes, including lying on your