USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/30/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM HENIG, on behalf of himself and all others similarly situated,

                Plaintiff,

v.

QUINN EMANUEL URQUHART & SULLIVAN, LLP and PROVIDUS NEW YORK, LLC,

                Defendants.

No. 13-CV-1432 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

The history of law, Oliver Wendell Holmes observed, "is the history of the moral development of the race." But many practicing lawyers—especially junior attorneys at large law firms—know that their jobs too often have less to do with the development of the human race or the law than with tasks that are necessarily repetitive in nature, modest in intellectual scope, and banal in character. Particularly in a litigation in which a good deal of money is at stake, attorneys generally must review thousands if not millions of documents and analyze them for relevance and privilege using their legal judgment. Many of those documents must then be reviewed and analyzed again (and often again) by others higher on the case team's chain of command. Not all of it is law at its grandest but all of it is the practice of law. Mr. Henig was engaged in that practice.

For approximately two months in 2012, Plaintiff, a licensed attorney, reviewed documents as a "temporary contract attorney" for Defendant Quinn Emanuel Urquhart & Sullivan, LLP. His job was rote. It entailed sitting in front of a computer and applying a series of "tags" to each document that indicated primarily whether the document was "responsive" to document requests

in an underlying litigation involving one of Quinn Emanuel's clients and if so, whether it was "privileged" and therefore protected from production. Plaintiff had no job duties other than reviewing documents, and he reviewed almost 13,000 documents over the brief course of his employment. As agreed, he was compensated at an hourly rate for his work.

Plaintiff has since brought this putative class and collective action alleging that he should have received overtime pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201, *et seq.*, and New York Labor Law ("NYLL"). Those statutes, however, exclude from their requirements overtime pay to licensed attorneys engaged in the practice of law. *See, e.g.*, 29 C.F.R. § 541.304(a)(1). Relying on that exclusion, Defendants moved for summary judgment. In opposing the motions, Plaintiff argues that the exemption does not apply because he was not required to exercise legal judgment in connection with the document review and thus was not engaged in the practice of law. The Court disagrees. Accordingly, Defendants' motions are granted and the case is dismissed.

## BACKGROUND[1]

### I.     Relevant Facts

#### A.     The Parties

Plaintiff is an attorney licensed to practice law in New York. QE's 56.1 ¶ 4. Quinn Emanuel is a law firm that specializes in business litigation. 2d Am. Compl. ("SAC") ¶ 3; Quinn Emanuel's Ans. ¶ 3. Providus is a limited liability company that provides law firms with attorneys and paralegals on contract and direct-hire bases. SAC ¶ 6; Providus' Ans. ¶ 6. After signing an employment agreement with Providus, Plaintiff worked on a document review project (the

---

[1] Unless otherwise noted, the facts are undisputed and derive from the following: Defendant Quinn Emanuel's Supplemented Rule 56.1 Statement of Undisputed Facts in Support of Its Motion for Summary Judgment ("QE's 56.1"), Plaintiff's Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1"), and the evidence submitted by the parties in connection with Defendants' motions.

"Document Review Project") for Quinn Emanuel and its client (the "Client") from August 16, 2012 through October 16, 2012. QE's 56.1 ¶¶ 1, 22, 29 & 32; Supp. Kitchens Decl. Exs. J, P.[2]

### B. Plaintiff's Hiring

During the summer of 2012, Quinn Emanuel contacted Providus to engage attorneys to perform the first level review ("First Level Review") for the Document Review Project. QE's 56.1 ¶ 1; Supp. Kitchens Decl. Ex. A at 13–14. To be employed on the First Level Review team, a prospective candidate had to be admitted to and a member in good standing of a state bar and pass a background and conflicts check. QE's 56.1 ¶¶ 2–3.

On August 10, 2012, an employee at Providus sent an e-mail about the Document Review Project to potential First Level Review team attorneys, including Plaintiff. *Id.* ¶ 5. The "parameters" of the Project listed in the e-mail included: "Duration: 2 months, could be more could be less"; "Rate: $35 flat"; "Hours: 57 min to 60 max/week, may ramp up higher at times"; "OT: flat rate over 40hrs/week [*sic*]"; and "Bar: Active any state." Supp. Kitchens Decl. Ex. D. On August 12, 2012, Plaintiff replied to the e-mail and confirmed that he was "admitted to NY bar and in good standing." *Id.*; *see also* QE's 56.1 ¶ 8. Plaintiff also sent the Providus employee a copy of his resume and completed a conflict check form, both of which were forwarded to Quinn Emanuel. QE's 56.1 ¶ 16.

On August 14, 2012, Plaintiff interviewed with a Quinn Emanuel contract attorney. *Id.* ¶ 19. The interview lasted a few minutes. Schulman Decl. Ex. 1 ("Henig Tr.") at 58–59. The contract attorney recommended that Plaintiff be hired, and on August 15, 2012, Plaintiff signed a contract with Providus. QE's 56.1 ¶¶ 21–22; Supp. Kitchens Decl. Ex. J. The contract purports

---

[2] Quinn Emanuel's Rule 56.1 Statement asserts that Plaintiff began work on "August 16, 2010," and Plaintiff agreed with this claim in his Counter-Statement. QE's 56.1 ¶ 29; Pl.'s 56.1 ¶ 29. That appears to be a typographical error, however, as Plaintiff's work on the Document Review Project occurred in 2012, not 2010. *See, e.g.*, Supp. Kitchens Decl. Exs. J, K & P.

to "set forth the terms and conditions under which [Plaintiff] will perform legal services for . . . Quinn Emanuel." Supp. Kitchens Decl. Ex. J. Plaintiff claims he "had no legal experience relating to" the subject matter of the litigation necessitating the Document Review Project, Henig Decl. ¶ 29, but acknowledges that, having gone to law school, he knew about and had received training regarding the attorney-client privilege, QE's 56.1 ¶ 14; Supp. Kitchens Decl. Ex. C (also "Henig Tr.") at 171.

### C. The Document Review Project

The Document Review Project involved reviewing and categorizing documents that had previously been identified using search terms. QE's 56.1 ¶ 44. Every document produced in the underlying litigation was produced only after being reviewed by attorneys, not merely because it included a search term. Id. ¶¶ 45–46. According to Quinn Emanuel, First Level Review team attorneys were expected to review approximately 40 documents per hour. Id. ¶ 128. According to Plaintiff, First Level Review team attorneys were expected to review 50 to 60 documents per hour. Henig Tr. 141–42.

Plaintiff began working on the Document Review Project on August 16, 2012. QE's 56.1 ¶ 29. On his first day, Quinn Emanuel provided Plaintiff with an orientation that lasted a few hours and included training on "Relativity," the electronic database that was used on the Document Review Project; a presentation on administrative issues such as billing procedures; and a substantive training regarding the scope and goals of the Document Review Project. Id. ¶¶ 33–36. Plaintiff contends that the substantive training was too brief to allow him to understand the nature of the claims at issue in the underlying litigation involving the Client. Pl.'s 56.1 ¶ 33.

The orientation included a 31-page PowerPoint presentation describing the Document Review Project (the "Presentation"). QE's 56.1 ¶ 37; Supp. Kitchens Decl. Ex. Q. The Quinn

Emanuel associate leading the orientation reviewed and provided a verbal explanation for each slide in the Presentation. QE's 56.1 ¶ 38. The Presentation includes a cover slide, 18 slides describing the nature of the underlying litigation, staffing, and claims at issue, and 12 slides specifically describing the Document Review Project. *See* Supp. Kitchens Decl. Ex. Q. Of the slides that address the Document Review Project, some include tables of relevant people and other information relevant to the Document Review Project and others identify certain "tags" and "sub-tags" the First Level Review team members were to use to categorize documents. *See id.*; *see also* QE's 56.1 ¶¶ 37, 40. Plaintiff testified that this set of slides was "almost like [his] bible" during the Document Review Project and that he "would refer to [it] exhaustively in tagging" documents. Henig Tr. 81. At various times during the Document Review Project, Quinn Emanuel provided First Level Review team members, including Plaintiff, with updated materials and at least one additional training session. QE's 56.1 ¶¶ 55–56; Henig Decl. ¶ 19.

The "tags" and "sub-tags" identify four principal ways in which the First Level Review team members could categorize the documents they reviewed: (1) "responsive" or "nonresponsive"; (2) privileged or not privileged; (3) "key" or "interesting"; and (4) not confidential. QE's 56.1 ¶¶ 47, 58, 79 & 85–86; Supp. Kitchens Decl. Ex. Q at 21.

### 1. Responsiveness

The Presentation instructs First Level Review team members to tag as responsive "documents responsive to [the operative] requests for production, limited by [the Client's] objections." Supp. Kitchens Decl. Ex. Q at 21. The Presentation similarly directs First Level Review team members to tag as nonresponsive documents that are either "not responsive to [the operative] requests for production" or "relate to a request for which [the Client] has declined to produce documents." *Id.* The presentation also refers to a "[c]hart of [the Client's] [p]ositions

5

with respect to [d]ocument [r]equests." *Id.* Quinn Emanuel provided First Level Review team members with the chart referenced in the Presentation and copies of the responses and objections to the operative discovery requests. QE's 56.1 ¶ 50; Supp. Kitchens Decl. Exs. V, W.

Plaintiff acknowledges he received these materials, but contends they do not accurately encompass the instructions he was given when reviewing documents for responsiveness. Pl.'s 56.1 ¶¶ 47–53.[3] Instead, Plaintiff contends that the Quinn Emanuel associate leading the orientation "told us to review documents to see whether they contained any of the terms or names included in the various lists and charts Quinn Emanuel gave us." Henig Decl. ¶ 11. To the extent that instruction conflicted with those in the Presentation, the Quinn Emanuel associate who led the orientation testified that "[i]f there were any inconsistencies between what was written . . . and what [he] said . . . , [he] would have expected someone to have followed [his] guidance during the presentation." Schulman Decl. Ex. 2 at 75.

According to Plaintiff, a document's responsiveness depended almost entirely on whether any of the terms or names contained in the lists and charts Quinn Emanuel provided appeared in the document. Plaintiff contends that "[i]f one of those terms or names was present in a document, then Quinn Emanuel almost certainly deemed the document responsive," whereas "[i]f a document did not contain one of those terms or names, then Quinn Emanuel almost certainly deemed the document non-responsive." Henig Decl. ¶¶ 12–13. Plaintiff claims that after asking a Quinn Emanuel attorney how to code a document, he was told "that [he] should mark responsive documents that contained the various terms and names included in the charts Quinn Emanuel gave us." *Id.* ¶ 20. Plaintiff further claims that "[n]o one from Quinn Emanuel ever told [him] that [he] should refer to actual document requests and objections thereto" or the chart of the Client's

---

[3] Plaintiff also asserts that he was not given sufficient time to review the written materials provided to him. *See* Henig Decl. ¶ 24.

6

positions with respect to the requests and objections referenced in the Presentation. *Id.* ¶ 21. In light of these claims, Plaintiff asserts that he "tagged documents as responsive or nonresponsive based solely on the criteria that Quinn Emanuel provided [him], rather than on [his] own interpretation of what documents were responsive or not responsive to the discovery requests." *Id.* ¶ 23.

### 2.     Privilege

The Presentation instructs First Level Review team members to tag as privileged "documents that *are* responsive/relevant, but that are subject to either the attorney-client privilege or work product privilege." Supp. Kitchens Decl. Ex. Q at 21 (emphasis in original). The Presentation also references separate sub-tags for the attorney-client privilege, work product, and the deliberative process privilege. *Id.* The Presentation, moreover, instructs First Level Review Team members to "review for privilege on all documents [they] consider responsive" and "err in favor of designating a document which has any possibility of being privileged as 'privileged.'" *Id.* at 26 (emphasis in original). One line in the Presentation explicitly states that "[p]rivilege can be tricky and there are a lot of gray areas." *Id.*

Plaintiff admits that one of his jobs was to determine whether or not responsive documents were privileged. QE's 56.1 ¶ 61. He disputes, however, that he was tasked with making privilege determinations independently. Plaintiff claims the Quinn Emanuel associate leading the orientation "told us that we should mark as attorney-client privileged any document that went from an attorney to a client or *vice versa*." Henig Decl. ¶ 15. According to Plaintiff, the associate "also told us that if an author or recipient of a document was neither an attorney nor a client, we should not mark it as attorney-client privileged." *Id.* ¶ 17. As for work product, Plaintiff contends he was

7

told "that if a document was already labeled as 'work product' . . . we should mark it as work product privileged." *Id.* ¶ 18.

On September 4, 2012, a Quinn Emanuel associate sent an e-mail to the First Level Review team modifying the instructions in the Presentation. Supp. Kitchens Decl. Ex. X. The e-mail states that "[u]p until now the instruction had been that if there was a whiff of priv[ilege] you should mark it privileged," but counsels that going forward "if you see and know that priv[ilege] has been broken you may now refrain from tagging it priv[ileged]." *Id.* In a follow-up e-mail, the associate made clear that if First Level Review team members "aren't comfortable making this type of determination (or if [they] feel it requires nuance) then tag the doc[ument] privilege[d]." *Id.*

### 3.    "Key" and "Interesting" Documents

The Presentation defines "key" documents as those "that *directly* relate to whether [the] claims [at issue] are actionable" and "interesting" documents as those "that are interesting or important to the case and you feel should be flagged for the group, such as documents that would be helpful in depositions or briefs." Supp. Kitchens Decl. Ex. Q at 21. The Presentation suggests that only 1% of documents will be tagged as "key" and only 10% of documents will be tagged as "interesting." *Id.* Plaintiff denies that he was instructed to use the "key" and "interesting" tags. Pl.'s 56.1 ¶¶ 79–84.

### 4.    Confidentiality

Documents in the Document Review Project were presumptively tagged as "confidential," and First Level Review team members were tasked with determining whether to remove that tag. QE's 56.1 ¶ 86. The Presentation instructs that documents are "[n]ot [c]onfidential" if they are "[p]ublic documents, new[s] reports, SEC filings, etc." Supp. Kitchens Decl. Ex. Q at 21. Plaintiff

8

acknowledges that his work on the First Level Review team included determining whether documents should be tagged as not confidential. QE's 56.1 ¶¶ 90–91.

### D. Subsequent Review

Whether documents received further review depended on the tags applied by First Level Review team members. Documents tagged as "nonresponsive" were withheld from production and received no further review, with the exception of a random sample of nonresponsive documents that were reviewed for quality control purposes. QE's 56.1 ¶ 127. Documents tagged as "responsive" and privileged were sent to a separate "Privilege Review" team. *Id.* ¶ 126. Finally, documents tagged as "responsive" and not privileged were sent to a "Second Level Review" team. *Id.* ¶ 125.

### E. Plaintiff's Work on the Document Review Project

Over the course of his time on the Document Review Project, Plaintiff worked 297 hours. QE's 56.1 ¶ 105. He reviewed 12,938 documents, tagging 10,103 as responsive. *Id.* ¶ 106. The parties agree that of the 2,835 documents Plaintiff tagged as nonresponsive, "most" were not reviewed by anyone else. *Id.* ¶ 109.[4]

Plaintiff tagged 1,845 documents as privileged. *Id.* ¶ 106. He tagged some of these documents to be withheld entirely and others to be redacted. *Id.* ¶ 107. Among the substantive tags Plaintiff utilized were the attorney-client privilege tag, the work product doctrine tag, and the deliberative process privilege tag. *Id.* At his deposition, when shown a document he marked as subject to the deliberative process privilege, Plaintiff testified that he "took a wing" based on the entity that created the document. Henig Tr. 189. A few times, Plaintiff could not determine

---

[4] At oral argument, counsel for Quinn Emanuel explained that "[t]here is no way to tell from the record before the Court" exactly how many documents that Plaintiff tagged as nonresponsive were in fact subsequently reviewed to check for quality control. Oral Arg. Tr. 14.

whether a responsive document was protected by a privilege. QE's 56.1 ¶ 113. Plaintiff testified that this occurred when it was not clear whether a document "was addressed from or to an attorney." Henig Tr. 102–03; *see* Pl.'s 56.1 ¶ 113. Quinn Emanuel rightly notes, however, that on three separate occasions Plaintiff included comments questioning whether particular documents were privileged and that those comments were not based on an attorney's name appearing in the documents. QE's 56.1 ¶¶ 114–15.

Plaintiff also tagged one document as "key." *Id.* ¶ 111. He testified that he tagged the document as "key" because it "didn't seem like something that should be buried" and appeared to be sent by a "head honcho who was pissed" and therefore "required further review." *Id.*; Pl.'s 56.1 ¶ 111; Henig Tr. 191–194. He did so, he testified, even though he did not understand the document to relate directly to the claims in the underlying litigation. Pl.'s 56.1 ¶ 111.

## II. Procedural History

Plaintiff initiated this action on March 4, 2013, bringing claims under the FLSA and NYLL. Dkt. 1. On April 26, 2013, Defendants moved to dismiss Plaintiff's Complaint. Dkt. 20, 23. On December 11, 2013, the Court denied Defendants' motions and ordered that the parties engage in discovery limited to the issue of whether Plaintiff was engaged in the practice of law. Dkt. 44.

On May 7, 2014, Plaintiff filed an Amended Complaint, and on July 3, 2014, he filed the Second Amended Complaint. Dkt. 74, 93.

Following discovery, on October 20, 2014, Quinn Emanuel moved for summary judgment. Dkt. 110. On October 23, 2014, Providus joined Quinn Emanuel's motion. Dkt. 112. On October 29, 2014, the Court held Defendants' motions in abeyance pending a decision by the Court of Appeals for the Second Circuit in *Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*, No. 14-3845, another case addressing whether contract attorneys employed to work on document review

projects are entitled to overtime under the FLSA. Dkt. 114. The Second Circuit issued its decision on July 23, 2015, and on the same day, the Court invited the parties to incorporate *Lola* into their arguments. Dkt. 116.

On August 14, 2015, Quinn Emanuel renewed its motion for summary judgment, and Providus again joined Quinn Emanuel's motion. Dkt. 119–20. Plaintiff opposed Defendants' motions on September 21, 2015, and Quinn Emanuel replied on October 8, 2015. Dkt. 121, 123. On October 29, 2015, the Court heard oral argument. *See* Dkt. 126.

## STANDARD OF REVIEW

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In ruling on a motion for summary judgment, 'the district court must view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party.'" *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir. 2002) (quoting *Gummo v. Vill. of Depew, N.Y.*, 75 F.3d 98, 107 (2d Cir. 1996)). A court, however, "cannot credit a plaintiff's merely speculative or conclusory assertions" of fact. *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012).

## DISCUSSION

Both the FLSA and NYLL exempt from their overtime requirements any employee employed "in a bona fide . . . professional capacity." 29 U.S.C. § 213(a)(1); N.Y. Comp. Codes

R. & Regs. tit. 12, § 142-2.14(c)(4)(iii)(a). Under Department of Labor regulations enacted pursuant to the FLSA, "professional" employees include "[a]ny employee who is the holder of a valid license or certificate permitting the practice of law . . . and is actually engaged in the practice thereof." 29 C.F.R. § 541.304(a)(1). Although NYLL does not include a similarly explicit exemption for licensed attorneys engaged in the practice of law, it "applies the same exemptions as the FLSA." *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010). Courts therefore frequently analyze overtime claims brought under the FLSA and NYLL jointly. *See, e.g., Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012) (declining to "engage in a separate analysis of plaintiffs' NYLL claims, which fail for the same reasons as their FLSA claims"). Because the parties here agree that the same standard applies to Plaintiff's FLSA and NYLL claims, the Court will analyze them together. *See* Oral Arg. Tr. 7, 15–16.

## I. Defining the Practice of Law

There is no dispute that Plaintiff "is the holder of a valid license or certificate permitting the practice of law." 29 C.F.R. § 541.304(a)(1). Plaintiff acknowledges he is an attorney licensed to practice in New York. *See* Pl.'s 56.1 ¶ 4; Pl.'s Opp. Mem. 9 ("[I]t is undisputed that Plaintiff is a licensed attorney[.]").

Whether Plaintiff is exempt from the overtime requirements of the FLSA and NYLL thus depends on whether he was "actually engaged in the practice [of law]" when he worked on the Document Review Project. 29 C.F.R. § 541.304(a)(1). The Second Circuit recently clarified that "the definition of 'practice of law' is primarily a matter of state concern." *Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*, 620 F. App'x 37, 41 (2d Cir. 2015). In *Lola*, the Second Circuit "f[ound] no error with the district court's conclusion that we should look to state law in defining the 'practice of law'" for the purposes of applying the FLSA. *Id.* at 42.

Because Plaintiff is an attorney licensed by the State of New York and the Document Review Project occurred in New York, the parties agree—as does the Court—that New York law applies to Plaintiff's claims. *See* Defs.' Mem. 13; Pl.'s Opp. Mem. 10. The parties further agree that, under New York law, the critical inquiry before this Court is whether Plaintiff's job duties included exercising legal judgment. Oral Arg. Tr. 7 (Quinn Emanuel arguing that Plaintiff is "relying solely" on his claim that he exercised no legal judgment), 15 (Plaintiff characterizing the exercise of legal judgment as the "pivotal question here").[5] Indeed, in *Lola*, the Second Circuit noted that "many . . . states . . . consider the exercise of some legal judgment an essential element of the practice of law." 620 F. App'x at 44–45 (collecting cases, including *Matter of Rowe*, 80 N.Y.2d 336 (1992)). Plaintiff therefore concedes that if his work on the Document Review Project required him to exercise legal judgment, he was engaged in the practice of law and Defendants' motion should be granted. *See* Oral Arg. Tr. 15.

## II. Whether Plaintiff Was Engaged in the Practice of Law

Defendants argue that Plaintiff exercised legal judgment as a member of the First Level Review team because his duties "included identifying whether documents were responsive, privileged, and/or confidential." Defs.' Mem. 16. Relying primarily on the language in the Presentation used during Plaintiff's orientation, Defendants characterize the work performed by First Level Review team members as encompassing a series of judgments that all required Plaintiff

---

[5] In denying Defendants' motion to dismiss, the Court identified three factors relevant to determining whether an individual has engaged in the practice of law in New York: (1) "whether the individual at issue renders legal advice to a particular client," *see Matter of Rowe*, 80 N.Y.2d 336, 341–42 (1992); (2) "whether [the individual] holds himself out as an attorney, *see A&E Television Networks, LLC v. Pivot Point Entm't, LLC*, No. 10-CV-9422, 2011 WL 6156985 (PGG) (JLC), at *1 (S.D.N.Y. Dec. 9, 2011); and (3) whether [the individual's] duties require him to draw on legal knowledge and judgment," *see Sussman v. Grado*, 746 N.Y.S.2d 548, 552 (N.Y. Dist. Ct. 2002). Dkt. 45 at 7. The parties here agree that courts interpreting New York law have applied some or all of these three factors. *See* Defs.' Mem. 13–14; Pl.'s Opp. Mem. 10. Although Defendants contend that Plaintiff has conceded the first two factors, while Plaintiff maintains that the first two factors are not relevant here, *compare* Oral Arg. Tr. 7 *with id.* at 15, the parties agree that the Court need only analyze the third factor to resolve this dispute.

13

to draw on his legal knowledge. *See id.* at 16–19. The Presentation indeed uses language that anticipates the need for legal judgment, particularly with regard to privilege, which the Presentation acknowledges is "tricky" and includes "a lot of gray areas." Supp. Kitchens Decl. Ex. Q at 26. If the Presentation were the only evidence in the record regarding Plaintiff's work on the Document Review Project, there could be little doubt that Plaintiff was called upon to exercise his legal judgment when reviewing documents.

Plaintiff, however, disputes whether the Presentation accurately describes the duties he was actually tasked with performing on the Document Review Project. *See* Pl.'s Opp. Mem. 15. Plaintiff contends that, despite what the Presentation says, Quinn Emanuel attorneys gave him verbal instructions that eliminated all legal judgment from his duties on the First Level Review team. With regard to responsiveness, Plaintiff argues he was "instructed . . . to tag documents responsive or not responsive based on the presence or absence of the terms or names included in the many lists and charts Quinn Emanuel provided," which required "merely the ability to read." *Id.* at 13. With respect to privilege, Plaintiff argues he was "directed . . . to mark as attorney-client privileged any document that went from an attorney to a client or *vice versa* and did not include a non-attorney or non-client among its authors or recipients," which required Plaintiff "merely . . . to identify attorneys and clients by referring to the lists and charts Quinn Emanuel provided." *Id.* at 14. As to work product, Plaintiff argues he was "told that documents already labeled as 'work product' were to be tagged as work product," obviating the need for any discretion at all. *Id.*

Even assuming that Plaintiff did receive verbal instructions that contradicted the Presentation, however, those instructions did not strip Plaintiff's work on the Document Review Project of all legal judgment. The *Lola* court concluded that attorneys exercise "no legal judgment" when in the course of reviewing documents, they "provide[] services that a machine

could . . . provide[]." *Id.* At oral argument, however, Plaintiff's counsel acknowledged that Plaintiff "did not plead that [he] did work a machine could do." Oral Arg. Tr. 16. Plaintiff instead contends that the "specific protocols" he was instructed to follow "involved a modicum of *human* judgment, but no *legal* judgment" in that the decisions he made when tagging documents did not "require[] or allow[ him] to draw on his . . . knowledge of legal principles." Pl.'s Opp. Mem. 13 & n.4 (emphasis in original).

Plaintiff's tagging history and his other descriptions of his role on the Document Review Project, however, confirm that his job involved more than the largely mindless task that would result from following the verbal instructions to the letter. In particular, Plaintiff's use of the deliberative process and "key" tags on certain documents, as well as his comments on the potentially privileged nature of other documents, make clear that Plaintiff's work on the Document Review Project involved the type of professional judgment necessary to be engaged in the practice of law. For example, Plaintiff testified that he "assumed" that the deliberative process privilege applied to one document because of the entity that created it, and that his decision required a "little simple judgment," even though he "took a wing" in making that determination. Henig Tr. 189, 227. He also testified that he tagged a document as "key" because it "didn't seem like something that should be buried." *Id.* at 192. Plaintiff's tagging on these documents, along with his comments on the potentially privileged nature of others, reveal that he understood the process by which he was meant to review documents could—and did—require him to exercise legal judgment. *See Oberc v. BP PLC*, No. 13-CV-1382 (KMH), 2013 WL 6007211, at *6 (S.D. Tex. Nov. 13, 2013) ("The mere fact that [document review] may be routine or constrained by guidelines does not make it any less 'legal.'").

Plaintiff contends that these "few examples do little to overcome the plausibility of [his] claim" because they all more or less amounted to guesswork that was not grounded in any legal knowledge. Pl.'s Opp. Mem. 20–21. To the contrary, these examples instead suggest that during the two months in which he participated in the Document Review Project, Plaintiff relied in some way on his legal knowledge and experience, including by concluding that the overwhelming majority of documents he reviewed did *not* require these tags. Indeed, the mere fact that Plaintiff tagged one document as key because it "didn't seem like something that should be buried," but did not so tag any other document he reviewed, helps establish that throughout his work on the Document Review Project he exercised the very judgment—legal judgment—he now disavows. *See* Henig Tr. 192.

Plaintiff's additional argument regarding the "re-review" by others of many of the documents he reviewed is also unavailing. *See* Pl.'s Opp. Mem. 17–18. Plaintiff concedes that most of the nearly 3,000 documents he concluded were nonresponsive received no further review. Pl.'s 56.1 ¶¶ 109, 127. If anything, this feature of the Document Review Project, by which Plaintiff made what amounted to final decisions regarding whether most of the documents he tagged as nonresponsive should be produced, further supports the Court's conclusion that he was engaged in the practice of law.

Plaintiff's other descriptions of his work on the Document Review Project reinforce this conclusion. According to Plaintiff, Quinn Emanuel did not always consider a document responsive or nonresponsive depending on whether it included any of the terms or names provided to Plaintiff, but rather "almost certainly" did so. Henig Decl. ¶¶ 12–13. Plaintiff therefore appears to acknowledge that the responsiveness of a document did not depend entirely on whether it included certain terms or names. *See* Pl.'s 56.1 ¶ 121 (describing how Plaintiff determined whether a

16

document was responsive or nonresponsive when he was not sure). Plaintiff also concedes that at times he could not tell whether or not a particular document was privileged and that on three occasions, he included comments regarding the potentially privileged nature of documents he reviewed. *Id.* ¶¶ 113–14. On those occasions, Plaintiff did not base his comments on the existence of any attorney names in the document. *Id.* ¶ 115.

The judgment exhibited by Plaintiff in analyzing those particular documents—as well as those to which Plaintiff assigned the "key" and deliberative process privilege tags—distinguishes the facts of this case from the allegations that survived a motion to dismiss in *Lola*. *See* Pl.'s 56.1 ¶¶ 111–12 (describing Plaintiff's rationale for tagging one document as "key" and another as subject to the deliberative process privilege). Plaintiff argues that he is in the same position as the plaintiff in *Lola* because he "performed document review under such tight constraints that he exercised no legal judgment whatsoever." *Lola*, 620 F. App'x at 45; *see* Oral Arg. Tr. 16, 20. The record here establishes otherwise.

In sum, even viewing Plaintiff's factual assertions about the instructions he received on the Document Review Project in the light most favorable to him, the Court concludes that he exercised legal judgment while working as part of a team engaged in the process of "rendering . . . legal advice and opinions directed to [a] particular client[]." *Matter of Rowe*, 80 N.Y.2d at 341–42. Plaintiff was therefore engaged in the practice of law under New York law. *See id.* Because Plaintiff is also "the holder of a valid license or certificate permitting the practice of law," 29 C.F.R. § 541.301(a)(1), he is a professional employee exempt from the overtime provisions of both the FLSA and NYLL. *See* 29 U.S.C. § 213(a)(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c)(4)(iii)(a). Accordingly, his claims under these statutes must be dismissed.

## CONCLUSION

Because Plaintiff was engaged in the practice of law, he was not entitled to receive overtime pay pursuant to the FLSA and NYLL. Defendants' motions for summary judgment are therefore granted and all of Plaintiff's claims are dismissed. The Clerk of Court is respectfully directed to close the docket entries at numbers 119 and 120 and to terminate this action.

SO ORDERED.

Dated:   December 30, 2015
         New York, New York

Ronnie Abrams
United States District Judge